GOODWIN FILM & CAMERA CO. v. EASTMAN KODAK CO.

(Circuit Court of Appeals, Second Circuit. March 10, 1914.)

No. 194.

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—PHOTOGRAPHIC FILM.

The Goodwin patent, No. 610,861, for a photographic film pellicle, being the rollable film used in amateur cameras, was not anticipated and discloses patentable invention. The application was filed in 1887, and in view of the state of the art at that time the invention was one of more than ordinary merit and the patent is entitled to a liberal construction. Also, *held* infringed as to claims 1, 6, 8, 10, and 12, which cover the process and product.

Appeal from the District Court of the United States for the Western District of New York.

Suit in equity by the Goodwin Film & Camera Company against the Eastman Kodak Company. Decree for complainant, and defendant appeals. Affirmed.

For opinion below, see 207 Fed. 351. See, also, 213 Fed. 239.

On appeal from an interlocutory decree dated September 9, 1913, holding valid and infringed claims 1, 6, 8, 10 and 12 of letters patent No. 610,861, granted to Hannibal Goodwin of Newark, N. J., September 13, 1898, for improvements in photographic pellicles and processes of producing the same. The application was filed May 2, 1887, and the patent was granted eleven years and four months thereafter. The bill was filed December 15, 1902, four years after the patent issued and ten years and eight months before the decision of the District Court sustaining the five claims as stated. Over a quarter of a century has thus elapsed between the filing of the application and the decree sustaining the patent.

The opinion of Judge Hazel is reported in 207 Fed. 351. The record contains 3800 printed pages and the briefs aggregate 575 pages.

Livingston Gifford and J. J. Kennedy, both of New York City (M. B. Philipp, of New York City, of counsel), for appellant.

Edmund Wetmore, Edward C. Davidson and Robert D. Eggleston, all of New York City, for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

COXE, Circuit Judge. Hannibal Goodwin was a clergyman residing at Newark, New Jersey, for thirty years prior to his death, which occurred December 31, 1900. His salary was small and for ten years prior to his death he had no regular charge. He was interested in chemistry and spent much of his spare time in chemical experimentation and research. The necessity for a transparent, sensitive pellicle for use in roller cameras had long been felt and Goodwin, though hampered by his inadequate surroundings, undertook the task of supplying it. The specification points out the manifest objections to supports of glass and of paper in combination with gelatin and other substances, and proceeds to state how they may be avoided. The patentee says:

"I have provided a pellicle the principal ingredient of which is nitrocellulose, or any equivalent * * * which is transparent, and insoluble in the usual developing, fixing and intensifying solutions or liquids used in photog-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

raphy. * * * In carrying out the invention I provide a suitable surface, such as that of glass, and flow over the same a solution of nitrocellulose dissolved in nitrobenzole or other non-hydrous and non-hygroscopic solvents * * * and diluted in alcohol or other hydrous and hygroscopic diluent."

When dry this solution forms a flexible transparent sheet or pellicle which is insoluble in any of the fluids employed in dry plate photography. The foil when stripped from the glass constitutes a supporting pellicle for the sensitive film. The specification states further that previous efforts to provide a transparent and flexible pellicle have been failures because they did not possess the properties of glass and were incapable of resisting the usual developing, fixing and intensifying solutions used in photography.

The patentee asserts that he has produced a film which is capable of resisting such fluids and of sufficient smoothness, hardness and toughness of surface for service in a roller camera. He says that in carrying out the invention he provides a suitable surface such as glass and flows over it the solution of nitrocellulose (as distinguished from "commercial celluloid") dissolved in nitrobenzole or other solvent not containing or capable of absorbing water. The equivalents for nitrobenzole are acetate of amyl and those non-hydrous non-hygroscopic fluid solvents of nitrocellulose which do not mix with water, are not greasy and are of slow volatility. Nitrocellulose when so dissolved and flowed over a smooth plate produces a smooth, transparent, imporous, impermeable film capable of being subjected to the photographic fluids without being affected thereby. It is further stated that the solution thus obtained by dissolving the nitrocellulose is diluted with alcohol or other similar diluent which serves to dilute or expand the volume of the dissolved nitrocellulose or increase its fluidity. The diluted solution is then applied to a smooth and hard surface, from which it may be stripped when dry.

Page two of the specification is largely devoted to a discussion of matters which seem to us to have little bearing on the questions here involved and especially so as it is stated that the entire page was inserted after the patentee learned of the defendant's process. The patentee on page 3 of the patent describes how he may reduce the cost by enveloping or imposing on the nitrocellulose supporting film a film of gelatin or coat a layer of gelatin with outer films of the non-hygroscopic nitrocellulose film, so that water or other solvents cannot gain access to the gelatin. The remainder of the specification is devoted to a description of the various ways in which the pellicle may be constructed and to an explanation of the drawings of the patent.

The claims in controversy are as follows:

"1. An improvement in the art of making transparent flexible, photographic-film pellicles, the same consisting in dissolving nitrocellulose in a menstruum containing a hygroscopic element and an element which is non-hygroscopic, the non-hygroscopic element being of itself a solvent of nitrocellulose, and of slower volatility than the hygroscopic element, depositing and spreading such solution upon a supporting-surface, and allowing it to set and dry and harden by evaporation, and spreading a photographically-sensitive solution on the hardened film, and drying the film, substantially as set forth."

"6. An improvement in the art of making transparent flexible, and elastic photographic pellicles, the same consisting in dissolving nitrocellulose in an

eventual celluloidal menstruum which is anhydrous and non-hygroscopic, spreading such solution upon a supporting-surface, allowing it to dry and harden, spreading photographically-sensitive matter thereon, and again drying and stripping the pellicle from said support, substantially as set forth."

"8. The process of making photographic pellicles which consists in subjecting nitrocellulose to the action of a menstruum combining fast and slow evaporating solvents, the slow evaporating solvent being non-hygroscopic and non-greasy in nature and quality and acting as an eventual solvent as described, spreading the solution upon a support and setting the same by evaporation, then applying photographically-sensitive matter and stripping, all substantially as set forth."

"10. As a new article of manufacture, a transparent film-support for photographic purposes, the same consisting of a thin, non-greasy, film, foil or pellicle of a dried and hardened celluloidal solution of nitrocellulose, combining in addition to the following essential properties of glass-plate supports, viz., insolubility in developing fluids, insensibility to heat and moisture, imporosity of structure, and hardness, smoothness, and brilliancy of surface the further desirable properties of exceeding thinness, lightness in weight, toughness in texture and elasticity in flexure; as and for the purposes specified."

"12. The process of manufacturing photographically-sensitive pellicles, consisting of flowing a non-photographically sensitive solution of nitrocellulose dissolved in a non-hygroscopic liquid, or a liquid which is eventually non-hygroscopic, and drying and hardening such compound into a support for the photographically-sensitive emulsion and imposing on such support the said sensitive emulsion, substantially as set forth."

Claim 10 covers the film support as a new article of manufacture and the other claims cover the process by which the pellicle is produced.

An examination of the first claim will demonstrate sufficiently the various steps of the Goodwin process for making a transparent, flexible photographic-film pellicle. These are:

First: Dissolving nitrocellulose in a mestruum containing a hygroscopic and a non-hygroscopic element, the latter being of itself a solvent of nitrocellulose and of slower volatility than the former.

Second: Spreading such solution upon a supporting surface.

Third: Allowing it to set, dry and harden by evaporation.

Fourth: Spreading a photographically sensitive solution on the hardened film.

Fifth: Drying the film.

At the time of Goodwin's invention the art was vehemently demanding, as a substitute for the glass plates then in use, a transparent photographic film capable of supporting the sensitive emulsion necessary in photography and also capable of being rolled up. Goodwin entered the field as an inventor for the sole purpose of overcoming the difficulties then existing and we think he did so when, speaking broadly, he discovered the process of dissolving nitrocellulose in a menstruum containing nitrobenzole and alcohol or their equivalents and then spreading the sensitive emulsion on the hardened film. He was subjected to almost unprecedented delays and disappointments in the Patent Office, which it is unnecessary to consider in detail, but he held tenaciously to his original conception of the invention.

Throughout the proceedings in the Patent Office and the courts Goodwin and his representatives have consistently asserted the proposition that he was the first to produce a pellicle by the above-named process. Others may improve the process and may, perhaps hold their

improvements, if patented, against the owners of the Goodwin patent, but this does not give them the right to appropriate the basic invention. We are unable to find any proof in the record to support the contention that his process was known by others prior to the date of his application. On the contrary the necessity for the patented pellicle became more and more apparent and the demand for it more and more insistent and many efforts were made to meet the demand, but with partial success only.

In 1887 an article appeared in the Photographic Times Almanac in which a well known authority on photographic subjects, Andrew Pringle, points out the pressing needs of the art in language which is prophetic of the Goodwin invention. He says:

"When we get a support such as I have indicated, transparent, flexible, and in lengths, tourist photography will make a stride that will throw into obscurity all previous advances."

And yet at the time this article was published, there was in the Patent Office an application showing that this stride had actually been taken.

In an affidavit made by Mr. Eastman in 1890, after describing his efforts to produce a satisfactory film, he says:

"From 1884 until the year 1888 I was constantly on the lookout for a fluid pyroxyline compound which would be suitable for the purpose of making such films."

It is unnecessary to advert to the other evidence in the record showing priority of invention in Goodwin. In addition to the presumption arising from the patent itself, we have his clear description of the process which any intelligent chemist would understand and which, if followed, must produce the desired film. Stripped of the unnecessary technical verbiage, which was largely produced by the proceedings in the Patent Office, Goodwin's statement is so plain that it would seem that a neophyte might follow the instructions successfully.

We cannot resist the conclusion that Goodwin's application, as filed in 1887, disclosed for the first time the fundamental and essential features of a successful, rollable film and that, unless constrained by some controlling consideration to do otherwise, the effort of the court should be to uphold the patent. The burden is on the defendants to prove its invalidity. The presumptions are all in its favor. Nothing in the prior art shows Goodwin's process and the proposition that any skilled chemist, familiar with the art as it existed prior to May 2, 1887, could construct the Goodwin pellicle cannot be maintained. We do not understand that the defendant now asserts that any one prior to Goodwin had produced a successful film roll system. The defendant's brief says:

"The Eastman Company, in 1888, devised and introduced its first 'Kodak' camera. * * * This 1888 Kodak * * * marked the beginning of amateur photography."

But it is not pretended that a film other than one having a paper support coated with sensitized gelatin, was used prior to Goodwin's invention or, indeed, prior to May 2, 1887. The proposition that these

paper films were used because they were inexpensive and thus available for trying out the film roll system is not persuasive.

The Eastman Company did not commence its experiments looking to the substitution of pyroxyline for paper as a film support until the latter part of 1888. These experiments were continued by Henry M. Reichenbach, the company's chemist, until February, 1889, and on April 9, 1889, he filed his application for a patent as assignor to the Eastman Dry Plate and Film Company and promptly received a patent dated December 10, 1889. During all this period, beginning with the experiments and ending with the patent, Goodwin's application was lying in the Patent Office. We are unable to see how the Reichenbach patent anticipates or limits the claims of the Goodwin patent. It may be that his process was an improvement on Goodwin and that during the life of his patent he was entitled to the exclusive use of such improvement, but it can have no retroactive effect, it cannot destroy or limit an invention which was in esse before his invention was conceived. The defendant's brief, after alluding to the extensive manufacture of the Reichenbach film since 1889, continues as follows:

"This is the industry which is enjoined by the decree of the court below—7 years after the expiration of the Reichenbach patent 417,202,—24 years after the Eastman Company began the manufacture of nitrocellulose film—and 26 years after the filing of the application on which the Goodwin patent issued. And this industry is enjoined on a patent the application for which was uniformly rejected by the five different Examiners who successively had it in charge during its eleven years' pendency in the Patent Office."

Truly an extraordinary and deplorable condition of affairs! But who was to blame for it—Goodwin or the five examiners who improperly deprived him of his rights during these eleven years? We are unable to see what he could have done to enforce his rights during this period or how any blame can attach to him for his inaction.

We have examined the printed articles published respectively, as follows: David, in 1881, 1882 and 1883; Les Mondas, 1883; Moniteur, 1885; British Journal of Photography, 1885; Year Book, 1869; Photographic News, 1881, and the prior patents to Journond, 1885–6; Parkes, 1855–6–65; Berard, 1857; Ollion, 1859–60; and do not find anticipation, even if these publications are considered in the aggregate. No pellicle possessing the Goodwin characteristics, made prior to the patent, is produced and yet we are asked to conclude that one could be produced by following the directions contained in these articles. The defendant must prove anticipation beyond a reasonable doubt and it has not done so. The best references are undoubtedly the Parkes patents and the disclosures of David to the French Photographic Society. Parkes, in his 1855 patent, was not concerned with photographic pellicles or the process of producing the same, but with making a substitute for india rubber and gutta percha consisting of a waterproof coating for fabrics which may also be used for book bindings, button making and similar purposes and may be pressed or rolled into different forms or thin sheets. In 1856 he was dealing with the substitution of collodion for glass as a support for the prepared film in taking photographs. He says, "or a thick layer of collodion may be first formed on the glass, and on this layer the film of prepared col-

lodion may be produced, and the picture taken thereon and suitably varnished or protected, afterwards the whole may be stripped from the glass together."

The 1865 patent has to do with the manufacture of "Parkesine," a product undoubtedly named in honor of the inventor, and his claim is "the employment of nitrobenzole, aniline and glacial acetic acid or either of them for dissolving pyroxyline in the manufacture of Parkesine and similar compounds of pyroxyline." He also claims the above ingredients in the manufacture of collodion.

David's contribution to the art is found in photographic journals which purport to give his remarks in explaining experiments made by him. These were tentative efforts on his part which he hoped might culminate in something practical, but they never did. The various articles contain expressions like the following:

"He believes that this substance is sufficiently transparent and flexible to form good material for photographic plates, provided it can be cut sufficiently thin. His various attempts to cut it have not been successful. I think they will have to render them less inflammable, for if only a spark falls on one of these leaves it is sufficient to produce rapid combustion. Mr. David presents films produced with celluloid which probably might serve as a support for the sensitized preparations. He says probably, because he has not yet been able to make the experiment. But we believe that the difficulty of manipulation and the high price of liquid celluloid would prevent this process from entering practical realms. One of our members has tried this process, but has not obtained good results in proceeding by successive coatings."

All this uncertainty and doubt is far from the clear and explicit statement required to anticipate a patent. There is no evidence that anyone ever did make the Goodwin pellicle prior to his invention and we are convinced that no one could have made it by following the directions of Parkes or David.

It is unnecessary to consider the question of invention, in all the details pointed out in the defendant's briefs, for the reason that we are convinced that Goodwin was the first to dissolve nitrocellulose in nitrobenzole or its equivalents diluted in alcohol or its equivalents. This being so, his patent is entitled to a construction broad enough to enable its owner to reap the profits which naturally and fairly belong to the invention. The invention is one of more than ordinary merit and the claims should not be so construed that any one may safely infringe who has wit enough to substitute equivalents for the elements named in the patent and to add or subtract therefrom, so long as the menstruum contains a hygroscopic and a non-hygroscopic element, the latter being a solvent of nitrocellulose and of slower volatility than the former. If the defendant uses a process having these elements, it matters not what else it uses or that its method is an improvement on the patented method.

Reverting to the first claim heretofore considered, there can be no doubt that the defendant's process employs all the elements there enumerated. The defendant contends that it does not employ the first element, as there stated, for the reason that in its process "the nitrocellulose is dissolved in a low boiling-point, rapidly-evaporating, hygroscopic and miscible-with water-solvent, wood alcohol and acetone * * * and in the use of this solution with the other ingredients

heretofore referred to (fusel oil and camphor) the defendant cannot operate 'under ordinary atmospheric conditions,' i. e., heat, during the spreading and drying of the nitrocellulose solution in order to secure the 'desired film.' "

Goodwin being the first to make the patented pellicle, is entitled to a fair range of equivalents, whether he claims them or not. His specification was addressed to chemists, not lawyers, and he was justified in assuming that a chemist would understand when he said in his original application that he used nitrobenzole or other solvent, that he meant other similar or equivalent solvent, one which would accomplish the same result in the same manner. A chemist knowing the object to be attained, would hardly have selected a solvent which could not accomplish that object. Knowing the properties of nitrobenzole, he naturally would seek an equivalent having similar properties and not one having properties which would defeat the object in view. Later on, in response to a demand from the Patent Office, Goodwin removed all doubt by actually stating, what we think the law implied, that he used "Nitrobenzole or other non-hydrous and nonhygroscopic solvents such as may be employed in producing celluloid, as distinguished from collodion." This amendment was within his rights. Hobbs v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586; Cleveland Foundry Co. v. Detroit Stove Works, 131 Fed. 853, 68 C. C. A. 233.

But without the amendment we can hardly imagine a chemist stupid enough to select the "other solvent" from those solvents which he must know would not do the work.

Goodwin says in the specification:

"In carrying out the invention I provide a suitable surface, such as that of glass, and flow over the same a solution of nitrocellulose (by which I do not mean a solution of the compound known as 'commercial celluloid' dissolved in alcohol or ether) dissolved in nitrobenzole," etc.

The defendant now argues that as commercial celluloid contains camphor, this language amounts to a disclaimer of camphor and that one who uses camphor in any amount, however small, avoids infringement. We think this contention is hypercritical and one which must be rejected by any fair and reasonable construction of the patent. Manifestly the patentee had in mind the amount of camphor used in commercial celluloid, which is said to be from 40 to 60 per cent. If he intended by the language to disclaim anything, it was such excessive use which, the proof shows, could not be successfully used to produce the result he had in view. He was endeavoring to distinguish his solution of nitrocellulose from the solution used in celluloid. In other words, he told the art that a solution containing from 40 to 60 per cent. of camphor would not do, but he never said that 13 or 14 per cent. of camphor would not do. Surely he did not intend to say that one who used his formula could avoid infringement by using other ingredients which did not effect the ultimate result.

We do not deem it necessary to enter upon a discussion of the Reichenbach interference further than to say that this, as well as most of the complications in the case, would have been avoided had the

Goodwin patent gone to issue in due course, as it should have done. The long delay and the contradictory rulings of the Patent Office would have discouraged an inventor who had not supreme faith in the justice of his cause. If we are right in thinking that Goodwin made a generic invention it follows that he is entitled to hold as infringers those who use the equivalents of nitrobenzole and alcohol. In the process of the patent, and of the defendant, nitrocellulose is used. In both it is dissolved in a menstruum containing a high-boiling, non-hydrous, non-hydroscopic solvent like nitrobenzole or its equivalents and a diluent like alcohol, or its equivalents. In both the processes of the defendant nitrocellulose is dissolved in a menstruum consisting of a high-boiling, non-hydrous, non-hygroscopic solvent and a diluent of wood alcohol. In the process of 1898 the solvent was amyl-acetate 5 parts, fusel oil about 16 parts and camphor 3 to 5 parts. The diluent was wood alcohol 104 parts. In the 1902 process the solvent was fusel oil 16 parts and camphor 3 parts. The diluent was wood alcohol 40 parts and acetone 40 parts. There can be no doubt that the defendant uses nitrocellulose and the diluent of the patent, viz., alcohol —wood alcohol being expressly referred to in the patent as an example of a diluent having a low boiling point and a relatively quick evaporating quality. The only debatable question relates to the equivalency of the defendant's solvent and we cannot doubt that the combination of fusel oil, camphor and amyl-acetate of the 1898 process and the fusel oil and camphor of the 1902 process are equivalents of the high boiling, non-hydrous, non-hygroscopic solvent of the patent. It matters not that the defendant's process produces better results than that of the patent. Assuming this to be true, it does not give the defendant the right to use Goodwin's discovery because it has introduced improvements. It would be strange, indeed, if during the fifteen years which elapsed from the date of the Goodwin application to the adoption of the 1902 process there had been no progress in the art. Undoubtedly there was progress, but as we have had occasion to point out before, one cannot use a patented invention because he has improved it.

Our decision may be briefly stated—believing, as we do, that Goodwin was the first to produce a transparent sensitive pellicle for use in roller cameras, the conclusion naturally follows that his patent is entitled to a liberal construction. Doubts should be resolved in its favor and care taken not to confuse the art at the date of issue with the art as it existed at the date of the application, eleven years before. So considered and construed, we think the claims in controversy valid and infringed.

We fully realize the incongruity of submitting a complicated question of chemistry to a tribunal composed of lawyers, even though assisted by such eminent chemists as Dr. Chanler and Professor Main, who have made comprehensible the salient features of an unusually complex and difficult controversy.

It is said that a motion is pending in the District Court for an order extending the time during which the complainant may recover profits and damages to the date of the Goodwin patent. This motion was postponed by stipulation until after the decision of this court and

we are asked to make this affirmance "subject to the motion and stipulation referred to." We do not see that any action by this court is necessary as the District Court will have full jurisdiction in the premises.

The questions arising on the other assignments of error are carefully considered and sufficiently discussed in Judge Hazel's opinion and we see no necessity for adding to what is there so clearly stated.

The decree is affirmed.