### PERMUTIT CO. v. HARVEY LAUNDRY CO. et al.

(District Court, W. D. New York. June 16, 1921.)

1. **Patents ⟷69—Foreign publications, to anticipate, must give full description.**

   Foreign publications, to constitute anticipations of a later patent, must disclose a complete and operative structure, and the description must be sufficiently clear, definite, and understandable to enable persons skilled in the art to construct it.

2. **Patents ⟷328—1,195,923, for a water-softening apparatus, held valid and infringed.**

   The Gans patent, No. 1,195,923, for a water-softening apparatus, consisting of a filter device in which the water is passed through a zeolite bed, with the result of making it absolutely soft, and also of means for restoring the zeolite when exhausted by flowing with a salt solution, held not anticipated by prior publications, valid, and infringed.

3. **Patents ⟷154—Disclaimer held valid.**

   A disclaimer filed some three years after issuance of a patent, the only effect of which was to limit it in a single feature, held valid.

4. **Patents ⟷112(3)—Issuance raises presumption of invention.**

   The rule that a doubt as to invention is to be resolved in favor of the patent is especially applicable in a case where the commercial utility of the device is beyond dispute.

5. **Patents ⟷62—Anticipation must be proved beyond reasonable doubt.**

   The burden rests on the party alleging it to prove anticipation beyond a reasonable doubt.

In Equity. Suit by the Permutit Company against the Harvey Laundry Company and the Refinite Company. Decree for complainant.

Philipp, Sawyer, Rice & Kennedy, of New York City (James Q. Rice and M. C. Massie, both of New York City, of counsel), for plaintiff.

Livingston Gifford, of New York City, John F. Stout, of Omaha, Neb., and Edward F. Colladay and David P. Wolhaupter, both of Washington, D. C. (Stout, Rose & Wells, of Omaha, Neb., and Shire & Jellinek, of Buffalo, N. Y., of counsel), for defendants.

HAZEL, District Judge. This is a suit in equity by the Permutit Company against the Harvey Laundry Company, a user of the apparatus in question, and the Refinite Company, intervener and manufacturer thereof, to enjoin infringements of letters patent No. 1,195,923, issued on August 22, 1916, on application filed August 5, 1911, to Dr. Robert Gans, of Pankow, Germany, who assigned the patent to the J. D. Riedel

Aktiengesellshaft of Berlin, Germany; the latter afterwards assigning to the plaintiff.

The patent relates to an apparatus for softening water by using a mineral substance of relatively small grains of zeolites or hydrated alumino-silicates and their exchangeable bases. In their natural state zeolite grains are found in the soil. Their composition consists of silicates of alumina sodium, potassium and calcium, and they possess an appetite for lime and magnesia. Upon water passing through them, the lime and magnesia become separated. Their natural existence and inherent chemical properties were discovered in the year 1849, and afterwards the discovery was made that they were capable of absorbing the lime and magnesia from the water—the constituents that make water hard—and of exchanging their silicate bases for new bases and returning to their first bases upon giving up the lime and magnesia and again obtaining sodium salt. The exchange of silicate bases includes the capacity of adapting them in an operative apparatus for frequent and continuous use. There are different kinds of zeolites; those found in the soil and those prepared by melting together the various constituents and hydrating them. Plaintiff's zeolites are of the latter class while defendants' material, known to the trade by the name of "refinite," after mining is baked and crushed for utilization. The patent, though limited to a zeolite softening apparatus is concededly not limited to any particular class of zeolitic material.

In 1906 the patentee (Gans German patent, No. 197,111) invented a form of artificial zeolites by fusing the constituents, viz. clays and soda ash, and hydrating them, to which he gave the arbitrary name of "permutite," and he found out that hard water could be continuously softened by filtration through them, and that the artificial zeolites could be regenerated by washing them with a salt solution after the exhaustion of their softening bases. Such discovery, however, was not immediately commercially useful, because the device then used for softening water was defective and, as hereinafter stated, failed to attain the desired result.

At such time those skilled in the art believed, and the possibility was suggested, that zeolites would even prove useful for obtaining gold from sea water, or manganese from water, or purifying sugar juices, as well as softening hard water for domestic and industrial purposes. But such ideas have not come to pass, except that for the latter use they have, in recent years, become highly useful. The utility of the apparatus in suit for producing absolutely soft water is undisputed.

To carry the invention into effect, a cone bottom cylindrical casing is described in the specification, closed at the top by a cover plate (b). Inside there are several perforated plates one at the upper end carrying a layer of gravel or quartz through which the water is first filtered to remove the dirt, while the other, lower down in the casing, supports a bed of grain zeolites through which the water passes; the bed having a free space or distance at the top so that the varying sized grains may adjust themselves when water is admitted. The specification says that the water to be softened passes downward from the supply pipe (k) at the top of the casing, through the inlet valve (m) and inlet pipe (l) to

the filter layer (e); thence through the zeolite bed (f), where the lime and magnesia are detained; thence through the supporting bed of gravel or quartz (g), to the water collecting chamber (h), and through the perforated screen (i) to pipe (j) located at the bottom of the casing. When the zeolites are exhausted the inlet valve (m) and outlet (n) are closed, and common salt is run through the filter valve (o) for restoration to their original condition; the salt solution and lime of magnesia entirely leaving the casing at (j) and waste valve (p) at the bottom. There are described means for back-washing the zeolites to completely remove particles of brine remaining from the regeneration and slime or other impurities from the filter. Such means consist of passing the water upwardly through the zeolite bed and filter and to the outlet (l). A stirring mechanism is also described but it is not involved herein. The proofs show that water of zero hardness by the use of zeolites was first produced in large quantities by the apparatus in suit. At such time, concededly, there were known structures for softening water (not zero hardness), but all operated on a different principle, and in the main comprised apparatus of the so-called precipitation type.

Claims 1 and 5 alone are involved herein. They read as follows:

"1. A water softening apparatus comprising a casing, a filter bed consisting of a layer of sand or quartz and a layer of zeolites or hydrated alumino-silicates disposed on the layer of sand or quartz, means for permitting the passage of water through the casing, means for cutting off the supply of water on the exhaustion of the zeolites, and means for passing through the casing a solution of a salt capable of regenerating the zeolites.

"5. Water softening apparatus comprising a casing, a filter bed consisting of a layer of zeolites or alumino-silicates, supporting means for said layer, means for permitting the passage of water through the casing, means for cutting off the supply of water on the exhaustion of the zeolites, means for supplying and passing into the casing a solution of a salt capable of regenerating zeolites and means connected to the lowest point of the casing for removing the salt solution so introduced."

Nothing is said in the patent as to any novelty in either a downward or upward flow of the water in the apparatus, but on February 26, 1920, during the pendency of this action, the plaintiff filed a disclaimer limiting claim one to means for the downward passage of water to be softened through the layer of zeolites. Thus limited, claim 1 has these elements in combination:

(1) Cylindrical casing.
(2) Filter bed of layer of sand or quartz.
(3) Layer of zeolites disposed on the layer of sand or quartz.
(4) Means for passing the water to be softened downwardly through the casing.
(5) Means for cutting off the supply of water on exhaustion of the zeolites.
(6) Means for passing through the casing a solution of a salt capable of regenerating or reconverting the zeolites.

Claim 5 specifies means for removing the salt solution after the regeneration of the exhausted zeolites at the lowest point of the casing.

The defenses are want of novelty anticipation by prior foreign publications, noninfringement, and invalidity of the disclaimer.

It is contended at the outset by defendants that the disclaimer substantially admits that the patentee was not the first inventor or discover-

er of the apparatus in question, or its substantial counterpart, and that it was filed to avoid anticipation by the prior art and foreign publications, and, in any event, that the flowing of the water in an upward or downward direction in the apparatus and through the zeolites were well-known equivalents.

[1, 2] The first question is whether the patentee was the first to successfully produce absolutely soft water in the use of zeolites by the adaptation of his patented apparatus. In answering it must first be determined what effect shall be given to the prior German patent, No. 197,111, dated April 6, 1908 (application October 28, 1906), and the later American patents, Nos. 943,535–960,887, and reissue, No. 13,686, to the inventor of the patent in suit, and assigned by him to J. D. Riedel Aktiengesellshaft, and the prior foreign publications—the Centralblatt article of September 7, 1907, containing the lecture or writing of Dr. Feldhoff, and the Zeitschrift article of May 28, 1909, by Dr. Siedler, together with his lecture, delivered in London, copies of which were circulated there and in this country more than two years before the application in suit.

Inasmuch as controlling importance is attached by defendants to what is described and illustrated in the prior foreign publications, the rule as to them may be stated here. Foreign publications, to constitute them anticipations of a later invention, must disclose a complete and operative structure, and, indeed, the description given must be sufficiently clear and definite and understandable to enable persons skilled in the art or science to which the invention or device belongs to practice and construct it. Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; Badische Anilin & Soda Fabrik v. Kalle (C. C.) 94 Fed. 163. Drawings or exhibits, if any, shown in connection with prior publications, must be considered with the published description of the device, which the law requires must be in "full, clear, and exact terms," so that those desiring to manufacture the article or reduce it to practice may do so without either independent experiments or the exercise by them of the inventive faculty. If the prior description and drawings relied on do not conform to that rule, a subsequently issued patent in this country for the same invention is not defeated. Hanifen v. Godshalk Co. (C. C.) 84 Fed. 649. In Robinson on Patents, vol. 1, § 329, it is stated that the invention described in the prior publication must be identical in all respects with that whose novelty it contradicts.

Such being the law, the assertion that the prior patents and foreign publications disclose the Gans patent in suit requires careful scrutiny of the evidence in support thereof. Did the prior publications and lectures teach the skilled in the art how to continuously produce absolutely soft water—that is, water of zero hardness—by flowing water through a zeolite bed contained in a filter device, or in any known container available to the public? The articles and lectures of Drs. Feldhoff and Siedler, who were skilled chemists in the employ of the Riedel Company, fairly establish extensive advertising of the Gans process for softening water by filtration. Not only was the process and its various uses in industrial fields extolled and exploited by the Riedel Company, but the manner of its utilization for purifying sugar juices and softening water,

and the particular filter with which the result was to be obtained were spoken of in such positive terms that softening water by zeolitic action was seemingly a very simple accomplishment.

Dr. Feldhoff, in submitting the result of his laboratory experiments, not only described an apparatus, but he used a sketch in connection therewith. He asserted that, to obtain soft water, the hard water is filtered in a casing through zeolites which, after exhaustion of their bases, are regenerated by washing with sodium chloride. Inlet and outlet valves attached to the casing were sketched and described by him, together with connections extending to a brine tank and a mass of gravel or sand in the filter for supporting the "permutite," that was placed between two perforated plates at the top, surmounted by a layer of excelsior, shavings, or gravel. In the tank or space near the top plate of the casing there was an outlet connection with pipes for passing the waste of the brine solution in back-washing. He specified the means for admitting hard water through pipes in the bottom of the casing, for the purpose of flowing the water upwardly, first through the supporting bed of gravel, then through the zeolites or permutite and excelsior, shavings, or gravel to the outlet. It was explained that, upon passing water through the zeolites, the sodium in the water exchanged for magnesium, with the result that the hard water became soft; that regeneration of the exhausted zeolites occurred upon introducing into the casing a salt solution, by means of a two-way valve positioned at the bottom of the casing, and operating, not only to disconnect the water, but also to connect a pipe for passing the salt solution upwardly to reverse the exchange of bases. In his laboratory experiments Dr. Feldhoff put the zeolites in a vessel and conducted the water downwardly, and upon doing so he said the water would be softened, and the regenerating solution could also enter the vessel at the top.

In the Zeitschrift article of May 28, 1909, Dr. Siedler referred to using a common filter for imbedding the permutite between "wood, wool or gravel," and said that the lime and magnesium salts normally in hard water would be completely removed by the operation; that the material would be regenerated by passing through the filter a salt solution, that this could be repeated as often as desired without impairing the zeolites, and that hard water would soften to zero degrees. In his lecture, delivered in London, he stated that the construction of the filter was to be determined by local conditions, and that it might be arranged either for an upward or downward flow of water. I find from the evidence, however, that the prior publications were not in fact a disclosure of plaintiff's apparatus. The differences in the prior description and the apparatus in suit, true enough, were simple, and even seem to be of a minor character; but they nevertheless were consequential, and by their adaptation an apparatus eventuated by which absolutely soft water is produced by the use of zeolitic material.

The filter device of the prior Centralblatt publication was defective, and because of its defective construction was inoperative and incapable of being put into practical use by the mere exercise of mechanical skill. The plaintiff's apparatus, as the specification of the patent clearly shows, does not assemble the material parts, so as to confine gravel or excel-

sior over the zeolite bed, or confine them between perforated plates as in the drawing or sketch of the Centralblatt article. The witness Kreigsheim swore that a filter apparatus corresponding to the description of the Centralblatt article was constructed in Germany by the Riedel Company, and was later inspected and examined by him, and that it did not fulfill the expectation of the designers in producing water of zero hardness and was abandoned. Upon opening the apparatus it was observed by him that the excelsior layer (marked *g* in drawing) had badly decayed, while the zeolites were discolored and streaked with dirt. It was deduced that the water evidently did not pass through the zeolite bed uniformly; some being exhausted and containing quantities of lime, while others, taken from the sides of the casing, had only small amounts of lime and were not exhausted. He further testified that channels had formed in the zeolites, through which much of the hard water was conducted to the outlet without softening.

Mr. Waterman, who testified as an expert for plaintiff, corroborated Kreigsheim in this particular, and asserted that the devices described in the prior publications did not suggest to the skilled in the art the apparatus of the patent in suit, and moreover that in his opinion the earlier filter was impracticable and could not continuously produce soft water. In this view he is supported, I think, by the inferences fairly deducible from the existing differences of construction and assembling of parts, and their co-operative relation of the earlier device and description and the patented apparatus. By the arrangement of parts in the apparatus in suit the zeolitic material was capable of self-grading, so that the finer material graded on top, and such adaptation I regard a valuable contribution to its success. To confine the permutite between screens in the way pointed out in the articles and lectures with either excelsior, wood, or gravel on top thereof, was a defect, in that it prevented the water from passing uniformly through, with the result that channels were formed through which the water flowed without being softened. Upon this point Mr. Waterman cogently testified:

"The lifting action to which I have referred tends to press the zeolitic bed against the under side of the superimposed layer *b*, indicated in the drawing of the Feldhoff article. If the superimpose screen *g* is coarse, as it might be to support a layer of excelsior, then the zeolitic material would be forced upward in the excelsior bed, clogging the latter. If, on the other hand, the material be sand or gravel fine enough to hold down the zeolitic bed, then the screen on which it rests must be extremely fine, and the apertures would themselves be clogged by the zeolites and the result would be a condition making the successful passage of cleansing water with a velocity sufficient to have a cleansing action impossible."

The arrangement by which the patentee provided means for first filtering the water and then passing it through the zeolites in such a way as to afford them space to adjust themselves after loosening up from the water eliminated the objectionable channeling. The specification does not refer to any free space over the zeolitic material, but the drawing attached thereto shows it. The defects and inefficiencies rendering the earlier device inoperative would not in my opinion have been relieved upon reversing the flow from upward to downward, even if gravel were used over the zeolites in place of excelsior. The bare possibility that,

if such changes or improvements had been made in the earlier Gans structure, it might have operated successfully cannot be considered to anticipate the patent in suit.

[3] It is earnestly insisted, however, that reversing the flow of water in the casing does not save the patent from invalidity, since the disclaimer was obviously filed to escape the effect of the prior publications, and is a substantial admission of anticipation; that, even if the disclaimer is valid, the claims are anticipated, because the ordinary skilled workman constructing a water softening apparatus would have selected a downward flow, in view of Dr. Siedler's suggestion in that relation and the prior filter patents in evidence. In Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968, the Supreme Court ruled that a disclaimer may extend to a particular part of a specification or single feature of a claim, but not if the purpose of the disclaimer was to change the description of the invention or convert the claim into somewhat different from that stated therein.

The limitations imposed by the disclaimer have not altered the description as originally filed by the patentee or in any way changed the claim, except to narrow its scope. The Supreme Court in the case cited above also said that the power to disclaim is a beneficial one, and should not be denied to an inventor, except where the power is used for a fraudulent or deceptive purpose. Such I find was not the purpose in filing the disclaimer herein.

There was no unreasonable neglect or delay in filing the disclaimer; it having been filed as soon as counsel for plaintiff was apprised of the Centralblatt article. In Simplex Railway Appliance Co. v. Pressed Steel Car Co., 189 Fed. 70, 110 C. C. A. 634, the Circuit Court of Appeals for this circuit approved of a disclaimer where its purpose had a limiting effect on the claim, even though it was filed 12 years after the patent was issued and upon direction of the trial court as a condition of the decree. Id. (C. C.) 177 Fed. 430; Schwartzwalder v. N. Y. Filter Co., 66 Fed. 152, 13 C. C. A. 380; Thompson v. Bushnell Co., 96 Fed. 238, 37 C. C. A. 456. In this case as in Marconi Wireless Tel. Co. of America v. De Forest Radio Telephone & Telegraph Co., 243 Fed. 560, 156 C. C. A. 258, the patent (if construed broadly) claimed something which the patentee did not need, and hence the disclaimer abandoned what was considered useless to the validity of his invention. I conclude, therefore, that the disclaimer in question was not invalid.

It is next contended that plaintiff is in the same position that the patentee, Gans, or his assignee, the Riedel Company, which presumably had authorized the prior publications, would be in, if this action had been brought by either of them against the defendants, and that plaintiff cannot now deny the adaptability of any known filter apparatus for softening water, "whether it contains zeolites or other filtering matter, because (quoting from defendants' brief) their prior patents, both German and American, were taken out on that basis." This contention is believed untenable. The patentee of the process for manufacturing the artificial zeolites certainly was not precluded from improving an inefficient or defective apparatus, even though it was constructed under his direction by the Riedel Company, nor was he precluded from after-

wards inventing a device based on a new mode of operation, or from assembling old elements in a new way to co-operate to attain a new result—a result that an apparatus conforming to the published description failed to attain and could not attain. It is true the process patents to Gans refer to a filtering device for softening water, but they contain no description of any apparatus, and therefore they are not anticipatory.

It is next contended that there are numerous prior filter patents in which zeolites could be successfully utilized for softening water to zero hardness; that they disclose a downward flow of water in the filter, and, with the knowledge imparted by them, any skilled mechanic could have produced an efficient apparatus. But I am unable to adopt this view of the modifications and changes subsequently made by Gans or by the Permutit Filter Company, a subdivision of the Riedel Company, in November, 1909, and again in the forepart of 1910, more than two years after the Centralblatt publications. Filters of the prior art, in my opinion, were unable to soften water for commercial uses without patentable changes. They operated on a different principle from the device in suit—the former filters to remove mechanical impurities from the water, while the latter softens water by chemical action.

The mere softening of the water by zeolitic action was not the only thing that the patent in suit accomplished. Certainly the regeneration of the exhausted zeolites for constant use or for repeated use is a significant feature—a feature that prior filters, such as shown in the Nearacher, Jewell, and Bommarius patents, could not accomplish. The cone bottom casing, layer of sand for filtering, the free space above the zeolites, the water flowing downward, the regeneration feature, in addition to the salt outlet at the lowest point of the casing, were elements combined in a new way to achieve a different result, viz. practicability, where there existed impracticability and failure. Cimiotti Unhairing Co. v. American Unhairing Mach. Co., 115 Fed. 502, 53 C. C. A. 230. In this connection it may be observed that there is evidence tending to show that Dr. Borrowman and Dr. Cross were unable to select from the filter art any water filter capable of accomplishing the desired result.

[4] I repeat that the granting of the patent raises a strong presumption of novelty, and, assuming the existence of a doubt, I am nevertheless required to resolve any doubt in favor of the patent. This rule is especially applicable in a case such as this, where the commercial utility of the apparatus is beyond dispute. Vacuum Cleaner Co. v. American Rotary Valve Co. (D. C.) 227 Fed. 998.

[5] It is next contended that the description of the Aquaril filter is an anticipation. Much importance was attached thereto as disclosing the combination of the claims in issue. A printed circular in evidence tends to show that such apparatus was used in Germany on December 20, 1908, and within two years of filing the application herein. As a prior use in a foreign country it concededly is not an anticipation, and as a prior publication it is insufficient. The Zeitschrift article refers to such filter, but the disclosure there made, and heretofore stated, does not defeat the patent in suit. Dr. Siedler states generally that filtra-

tion might be upwards or downwards, leaving it a matter of selection rather than preference; but he did not suggest a combination of the elements or parts in relation to each other in a way to accomplish the desired result. In asserting that the zeolites were imbedded between wooden shavings or gravel, he fell into error, and his description did not inform the art how an apparatus could be successfully constructed. The burden is upon the defendants to prove anticipation beyond a reasonable doubt. They have not done so. Goodwin Film & Camera Co. v. Eastman Kodak Co., 213 Fed. 231, 129 C. C. A. 575; Coffin v. Ogden, 18 Wall. 121, 21 L. Ed. 821.

The Aquaril apparatus trade circulars in evidence do not remedy the insufficiency of the prior publications. Aside from this, plaintiff's apparatus, as already remarked, was not completed in Germany until the autumn of 1909, about six months after the Zeitschrift article, and, in the circumstances, the presumption is not unwarranted that the Aquaril filter did not embody the combination in suit.

There was also evidence of prior use by Hird & Sons of a zeolite apparatus, which had been converted from a Keystone water filter, but is inconsequential, since the alteration involving a new assembling of the elements was made long after the patent in suit was issued. It is far short of establishing prior use, or that because of the alteration made the patent in suit is lacking in novelty.

The testimony of experiments by defendants' witnesses Terry and Partridge, included in the record, was not taken before the court. It is to the effect that zero hard water was obtained by them in their experiments from a device constructed to correspond with the description of the Centralblatt article. In its operation the water was caused to flow downward in the casing through the zeolites and at times upwardly, with the result, as the witnesses testified, that soft water was produced. The testimony tends to contradict Mr. Waterman as to the inoperativeness of the earlier device and the prior descriptive apparatus; but, in view of the fact that it was a part of defendants' affirmative case, and not surrebuttal, it is doubtful whether the testimony should be considered. The witnesses were not cross-examined, and no notice had been given to plaintiff of the experiments. The cases hold that ex parte experiments are usually disregarded by the court. Bemis v. Stevens & Bros. (C. C.) 117 Fed. 717; Bethlehem Steel Co. v. Niles-Bement-Pond Co. (C. C.) 166 Fed. 880; Plunger Elevator Co. v. Standard Plunger Elevator, 165 Fed. 906, 91 C. C. A. 584.

Counsel for plaintiff, however, has freely discussed the experiments in his brief, and pointed out various changes in the structure used in conducting them, to which consideration has been given. The conclusion reached by me is that the modifications were of enough importance to make the experiments valueless as evidence. Other points discussed at the bar, relating to invalidity, anticipation, and false oath by the patentee, have not been overlooked; but I do not think they are substantial.

As to infringement: The apparatus used by the defendants is not constructed from the descriptive matter in any prior publication, but it is a substantial embodiment of the combination in suit, and accomplishes

the same result. Its casing is provided with a cement bottom, in which the nozzle piping leading to the brine outlet is imbedded. On top of this cement bottom there is a bed of gravel, and over it a bed of zeolitic material, with a free space above it to enable the grains to float and adjust themselves upon the water entering the casing as in plaintiff's apparatus, namely, through a pipe at the top flowing downwardly through the zeolite bed, and from there to the outlet. The filter for the hard water is on the outside of the device, and not within it, as in plaintiff's; but this difference is believed unimportant. There is also a pipe extended to the brine tank, which introduces salt water into the casing to regenerate or reconvert the exhausted zeolitic material. In this manner the zeolites, as in plaintiff's apparatus, give up to the brine solution the lime and magnesia taken up in the process of softening the water, and then, upon taking up the sodium, restore them to their original condition. By using such co-operative means the defendants have appropriated the plaintiff's apparatus as specified in claim 1. After the regeneration of the exhausted zeolites, the brine in defendants' apparatus is washed out in the same way as in plaintiff's, and the water run out at the bottom of the casing. As the exit pipes are attached to the casing on a level with the surface of the cement bottom, the salt solution may be wholly withdrawn at that point, and hence claim 5 in issue is also infringed by the defendants.

As the claims in suit are found to be valid, and to have been infringed by defendants, as contended by the plaintiff, an injunction and accounting is decreed, with costs.