PLUNGER ELEVATOR CO. v. STANDARD PLUNGER ELEVATOR CO.†

(Circuit Court of Appeals, First Circuit. December 4, 1908.)

No. 737.

PATENTS (§ 328*)—INFRINGEMENT—HYDRAULIC VALVE MECHANISM.

The Cole patent, No. 700,740, for valve mechanism for hydraulic elevators, designed to permit a quick start of the elevator and secure an automatic slow stop, construed, and *held* to be of a sufficiently primary character to be entitled to a reasonably broad application of the doctrine of equivalents, and, as so construed, infringed by a device in many respects similar to the Larsson patent, No. 786,654.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the District of Massachusetts.

For opinion below, see 153 Fed. 747.

Frank T. Brown (Francis A. Hopkins, on the brief), for appellant.

Clifton V. Edwards (Louis W. Southgate, on the brief), for appellee.

Before PUTNAM and LOWELL, Circuit Judges, and ALDRICH, District Judge.

LOWELL, Circuit Judge.   This was a bill in equity to restrain the infringement of letters patent No. 700,740, issued May 27, 1902, for improvements in hydraulic valve mechanism, granted to the complainant as assignee of Cole, the inventor.   The Circuit Court dismissed the bill, and the complainant has appealed.   The patent has 29 claims, and we find no enumeration of those which the complainant put in issue.   The following may be taken to illustrate fairly the scope of the patent:

"(2) The combination with the main three-way valve, of means for opening and closing said valve in either direction, and automatic means for regulating the opening and closing movements at different rates of speed.

"(3) The combination with the main valve for controlling the passage of fluid under pressure, of means for opening and closing said valve, and automatically-operated quick-opening, slow-closing means connected with said main valve, whereby the speed of opening and the speed of closing the main valve are regulated within independent limits, substantially as described.

"(4) In a hydraulic elevator the combination with a main valve, of a valve-motor, pilot-valve mechanism, and an opening and closing regulating means operated by movement of the main valve, whereby a quick opening and a slow closing of the main valve are effected.

"(5) The combination with the main valve for controlling the passage of fluid under pressure, of motor means for opening and closing said main valve, secondary valve mechanism for controlling the motor means, and hydraulic opening and closing regulating means for automatically regulating the velocity at which the main valve may be opened and the velocity at which the main valve may be closed at independent rates, substantially as described."

The patent is concerned with the control of plunger elevators. Speaking generally, the car of a plunger elevator is borne upon a plunger, or large metallic rod with piston, which moves perpendicularly in a closed casing or cylinder.   The plunger and car are raised by the admission of water to the cylinder beneath the plunger.   They are lowered by the exhaust of this water.   A quick upward start of the elevator can easily be secured by a quick supply of water beneath the plunger.   A quick stop during the ascent can easily be secured by a quick cessation of the inflow.   The converse is true of a descending elevator and of the exhaust of water beneath it.   On the other hand, by throttling the supply and exhaust, by providing a slow cessation of the inflow and outflow, it is easy to secure a slow start and a slow stop.   In experience, it has been found that a jerky stop discommodes the passengers, and, when carried to an extreme, causes the plunger to bound upon the surface of the water, giving a disagreeable jolt to the passengers, and in some cases straining the machinery of the elevator.   Cole sought to obtain a control which both permits the quick start desirable in order to save time, and also insures a slower stop, the latter operated automatically, unaffected by the

carelessness or ignorance of the elevator boy. This also could, easily be secured if the start was always caused by the admission of water beneath the plunger, and the stop always caused by the cessation of the inflow; the inflow could be checked slowly. But the start of an ascending elevator is caused by the admission of water to the plunger cylinder, while the start of a descending elevator is caused by the exhaust of this water. The problem was to provide for a possibly quick start and a certainly slow stop of the elevator, whether the start was caused by the supply or by the exhaust of water; whether the stop was caused by a cessation of the outflow or of the inflow.

The mode of operation of the patent in suit is stated in the specifications. The weight of the car being for the most part counterbalanced, the car is raised by the admission of water below the plunger, and lowered by the exhaust of the same water. Water enters the plunger cylinder below the plunger through the main valve, which is opened and closed by a piston moving in the main valve cylinder. The movement of the same piston also controls the exhaust of the water beneath the plunger. The main valve piston, as shown, is operated by the movement of a motor piston in a motor cylinder, the two pistons being connected so as to move backward and forward together. When the main valve piston is centered in the main valve cylinder, the main valves are closed and the elevator is at rest. When this piston is moved to the right, the main supply valves are opened, water enters beneath the plunger, and the elevator rises; when the main valve piston is moved to the left, the main exhaust valves are opened, and the elevator descends. The motor piston is moved in the motor cylinder by the admission and exhaust of water through the same port on one side of the piston; on the other side of the piston is a constant but lesser pressure in the other direction. The admission of water to the motor cylinder and the exhaust of water therefrom are controlled by the valves of the pilot cylinder. These pilot valves are opened and closed by the movement of the pilot piston, and this piston, through suitable connections, is moved by the operating lever. Stated in another way, the sequence of movement in raising the elevator is as follows: The operator moves the lever; the lever moves the pilot piston; the pilot piston opens the supply valve of the pilot cylinder, and thus admits water to the motor cylinder; the water in the motor cylinder moves the motor piston to the right, as shown in Figure 4; the motor piston, being connected with the main valve piston, moves that also to the right; the movement of the main valve piston opens the main supply valve; the main supply valve admits water below the plunger; the plunger is raised, carrying the elevator with it.

The combined movement of the main valve and motor pistons returns automatically the pilot piston in the pilot cylinder to close the pilot supply valve. Thus the further supply of water is cut off from the motor piston, and the motor piston and main valve piston remain stationary at the right. The main supply valve, however, remains open, and water continues to flow through the main supply valve beneath the plunger, and the elevator continues to rise.

When it is desired to stop the ascending elevator, the operator moves

the pilot piston by means of the lever. The pilot piston opens the exhaust pilot valve. Through this valve the water is exhausted from the motor cylinder by the counter pressure referred to, the motor piston is moved to the left, and with it the main valve piston is carried to the left to close the main supply valve. This movement, by appropriate connections, returns the pilot piston to close the exhaust valve of the pilot cylinder, and both main valve piston and motor piston are brought to rest in a central position, the main valve being closed and the water beneath the plunger being stationary.

In addition to these movements, and to the valves, cylinders, and pistons already mentioned, the patent contains an auxiliary piston and valve for the purpose of controlling and throttling the passage of water from or to the motor cylinder during the centering movement of the motor piston to stop the elevator. As has been said, the problem was to provide a possibly quick start of the elevator, either going up or down, and a certainly slow stop. The throttling mechanism, as shown, has two free and two throttled ports, a free port and a throttled port for the admission of a supply of water, and a free port and a throttled port for its exhaust. The throttled ports of the auxiliary valve are always open. The free ports are opened and closed by the movement of the throttling piston. This piston is connected with the main valve piston and the motor piston, so that when these two pistons are moved to the right in order to raise the elevator, as shown in Fig. 4, their movement thus extended moves the throttling piston to close the free exhaust port, leaving open only the throttled exhaust port. When, therefore, the pilot piston is moved to open the exhaust port of the pilot cylinder in order to stop the ascending elevator, as above described, the water exhausts from the exhaust port of the pilot cylinder only through the throttled port of the auxiliary valve, the exhaust is therefore slow, and the elevator stops slowly. When a descending elevator is stopped, the above-described movements are reversed, the supply port is throttled, and, as the elevator is stopped by the supply of water, the stop is still slow. Inasmuch as the main valve piston and motor piston are both at the right or at the left of Fig. 4 only when the elevator is in motion, either ascending or descending, while their return to the center means a stop of the elevator, it follows that the admission of water to the pilot cylinder to stop the descending elevator, and its exhaust from the pilot cylinder to stop the ascending elevator, must both be through a throttled passage, and hence the start may be quick, while the stop is necessarily and always slow.

We next consider the defendant's device alleged to infringe. The defendant contends that it is exemplified in the letters patent No. 786,-654, issued April 4, 1905, to Larsson for "new and useful valve mechanism for hydraulic elevators." This is true in general, and so far as described below. In the Larsson patent there is no motor cylinder or motor piston, as distinguished from the main valve cylinder and main valve piston. The main valve piston is moved to open and close the main valves by the operation of water admitted directly from the pilot valve. To start a Larsson elevator upwards from the position

of rest, the operator lowers the lever and with it the pilot piston. The fall of the pilot piston opens the pilot valves. The opening of the pilot valves through suitable connections releases the water in the main valve cylinder to the left of the main valve piston. This release of water causes the main valve piston to move to the left under the constant pressure. This movement of the main valve piston to the left admits water through the main supply valve to the plunger cylinder beneath the plunger. From this description of the operation of Larsson's patent in starting the elevator to ascend may readily be prepared a list of the movements necessary to stop its ascent or to start or to stop its descent.

The movement of Larsson's main valve piston to left or to right in order to admit or to exhaust water from the plunger cylinder automatically rotates by a broad-faced pinion a perpendicular rod. A screw on the end of this rod enters a nut in such a way that the rod rises and falls perpendicularly by its own revolution. To this rod the pilot piston is so attached that they rise and fall together. The movement of the main valve piston, therefore, by means of the pinion, automatically raises the rod, and with it the pilot piston. The pilot valves, which had been opened by the fall of the pilot piston, are thus closed by its rise, and no more water is admitted to the pilot cylinder; but the main valve piston remains at the extremity of its cylinder, water continues to flow into or exhaust from the plunger cylinder, and the elevator continues to rise or to fall.

To the rod above mentioned are attached helices or screw cams. The casing in which the rod slides and turns also has cams attached thereto, having the same pitch as the screw and as the cams first mentioned. These sets of cams are so related to each other that the lever cannot be thrown from one side to the other, from a complete opening of the supply ports to a complete opening of the exhaust ports of the pilot valve, without permitting the main valve piston first to come to rest in the center of its line of operation. Hence the movement of Larsson's elevator cannot be changed from ascent to descent without an intermediate period of rest. This is the advantage set out in Larsson's specifications.

The defenses here set up are substantially two: First, the defendant denies that the defendant's machine in fact accomplishes or is intended to accomplish a quick start and a slow stop, but contends that its sole purpose is to prevent a careless operator from violently reversing the motion of the elevator. The defendant asserts that, both theoretically and practically, the start and the stop of the defendant's machine are of equal duration. The complainant, on the other hand, asserts that the arrangement of the cams prevents a free opening of the pilot valves when the pilot piston is moved to stop the elevator. If this defense is true in fact, manifestly the defendant does not infringe. Second, the defendant contends that, even if the defendant's machine permits a quick start while securing a slow stop, yet it accomplishes that result by a mechanism materially different from that of Cole, a mechanism which is outside the scope of Cole's patent properly construed. Here the decision depends upon the proper scope of

the doctrine of equivalents as applied to the Cole patent. We consider these two defenses in their order.

The evidence that the defendant's pilot valves are so throttled as necessarily to cause a slow stop of the elevator is unsatisfactory. We disregard altogether the report of tests made apparently by a skilled operator, some of them in the absence of the complainant or of doubtful interpretation, and in all so few as to be valueless. Both parties have in effect agreed to stake the decision of the case upon an inspection of a nondescript model shown in court, one half of which was introduced by the defendant as an exhibit in the case, being the defendant's pilot valve and auxiliary mechanism. The other half of the model is a wooden chalk, asserted by the defendant to be a diagram substantially accurate, but depending for its accuracy upon precise measurements, and even upon an accurate employment of colors. The complainant, however, may fairly contend that this model amounts to an admission by the defendant. Both parties admit that the greatest possible throw of the lever, made while the main valve piston is accurately centered for closing the main valve and so while the elevator is at rest, and made in order to open the ports of the pilot valve and to start the elevator up or down, opens those ports more widely than they can be opened by any movement of the same lever while the main valve piston is at either extremity of its cylinder, i. e., while water is most freely admitted or exhausted beneath the plunger, and while the elevator is in motion. Moreover, it is plain that the rod bearing the movable cams which limit the throw of the lever, and which rod is revolved through a rack and pinion by the movement of the main valve piston, does not make a complete revolution while the piston is passing from its centered position closing the main valve to its extreme position at either end of the cylinder to open the supply or exhaust most fully. Perhaps the turn of the rod amounts to five-sixths of a revolution. Hence the distance of the revolving from the stationary cams is not the same at the two positions, and the possible throw of the lever is greater to start the elevator than to stop it. From inspection it also appears that the distance between the movable and stationary cams is greater when the main valve piston is accurately centered and the elevator is at rest than when the main valve piston is at either extremity of its cylinder and the elevator is in motion. These undoubted facts appear to contradict the defendant's statement above quoted.

But the defendant asserts that the initial movement of the main valve piston from an accurate centering does not immediately begin to open the main valve; that there is a certain amount of lost motion caused by the overlap of the main valve piston beyond the opening of the main valve. The defendant here contends, and the contention is borne out by an examination of the model, that, if the comparison is made between the possible opening of the pilot valves at the moment when the main valve piston just begins to uncover the main valve, and the possible opening of the pilot valves at the moment when the main valve piston just begins to cover the main valve, these possible openings are the same. Hence the defendant contends that

the pilot valves are in effect opened as widely to stop the elevator as to start it.

The defendant's argument thus made is not conclusive. In starting the elevator, the main valve piston has begun to move, and has acquired momentum before it begins to uncover the main valve, while, upon the return of the piston to stop the car, it begins to cover the main valve as soon as it begins to move. This increased momentum of the main valve piston appears to differentiate the start of the car from its stop. Still further, the complainant contends that various ports in the pilot valve, somewhat obscurely seen, remain open even to the time when the main valve piston is moved to its extremity, strengthening and quickening that movement, while, upon the return, these ports are closed early in the movement of the main valve piston, so that the elevator comes slowly to a stop.

While the court is embarrassed by the nature of the model before it, and by the want of expert testimony thereupon, yet upon the whole, considering that the model was produced and is now relied upon by the defendant, we find that the complainant has sustained the burden of proof which rests upon it to show that the defendant's elevator has an automatic slow stop, a stop which is slower than its normal start.

We are left to consider only if the means by which this stop in the defendant's machine is produced are the mechanical equivalent of those of the patent. It is urged that the defendant's valves are throttled, not by the movement of the main valve piston, as in the patent in suit, but by the operation of the lever in the hand of the elevator boy. In a sense this is true, but in the defendant's machine the movement of the main valve piston so arranges the cams which control the throw of the pilot piston by the lever that the throw of that piston in stopping the elevator cannot open the ports so widely as they are opened by the throw of the piston at the start. This throttled opening of the pilot valves, while not directly the automatic operation of the main valve piston, is yet produced by an arrangement of cams, automatically brought into proper arrangement by the movement of the main valve piston. In the patent in suit and in the Larsson patent the throw of the lever admits water to the pilot cylinder or exhausts water therefrom. If the lever is moved to stop the elevator, admission and exhaust are only through a throttled valve. So far the two patents are the same. In the patent in suit, the movement of the main valve piston then causes the throttling piston to close the free valve, leaving the water to pass only through a throttled valve. In the Larsson patent the movement of the main valve piston arranges a set of cams so that the pilot piston (which here acts also as a throttling piston) necessarily itself throttles the valves of the pilot cylinder. In both cases we may fairly say that the pilot valve is throttled by the movement of the main valve piston. Considering the nature of the invention, that it appears to be the first in which a comparatively quick start and an automatic slow stop were obtained by the throttling of the pilot valve through the operation of the main valve piston, we are of opinion that the doctrine of equivalents should

receive a reasonably broad application, and that the doctrine, when thus applied, establishes the substantial identity of the defendant's machine with the patent in suit. Neither complainant nor defendant have treated the claims in suit separately, and this has embarrassed our consideration of the question of infringement. Without saying more, we hold that the patent is valid and has been infringed by the defendant.

The decree of the Circuit Court is reversed, and the appellant recovers its cost of appeal.

PUTNAM, Circuit Judge (concurring). I concur in the conclusion reached by the court, but I think that the case does not depend on the model to which the opinion refers. It seems to me that the complainant's invention involves the following elements: The main valve comes to an easy rest on its return stroke—that is, in connection with the lever movement which stops the elevator; this easy rest necessarily results from an automatic action produced by the main valve; and the movement in starting the valve may be slow, moderate, or quick, as determined by the operator. In this I agree entirely with the expressions of the opinion, filed in behalf of the court, that Cole sought to obtain a control which both permits a quick start and also insures a slower stop, the latter operated automatically. It also seems to me that, on the settled rule of the Supreme Court, as clearly stated by the learned judge of the Circuit Court, any claims broader than this statement of the complainant's invention are invalid.

It also seems to me that Prof. Main is the expert testifying for the respondent who is fully capable of mastering the mechanical laws involved in the complainant's invention, and in the patent on which the respondent relies, and which it claims to have adopted in constructing its machines; and that, looking at his testimony by and large, it contains an inevitable admission that precisely the elements found in the complainant's invention are found in the respondent's patent, and are availed of for the same purpose, with the addition of an incidental safety device which assists in preventing a sudden reversal. I note here only one extract from his testimony, as follows:

"X-Q. 19. In defendant's valve mechanism the main valve is positively connected to the pilot valve, and the two so arranged that by the automatic action of the main valve, which causes the pilot valve to cover or close some of the ports of such pilot valve, the flow is gradually cut off, and will gradually stop the movement of the main valve as it comes to central position, and thereby gradually stop the movement of the elevator. Is not this so? A. Undoubtedly.

"X-Q. 20. This is likewise true of the valve mechanism of the Cole patent in suit, is it not? A. Yes.

"X-Q. 21. And in both defendant's valve mechanism and the complainant's patented valve mechanism the pilot valve is positively connected to the main valve, so that it is automatically returned to central position by the main valve through this positive connection. Is not this so? A. It is."

It would hardly be fair to pin Prof. Main too closely to these answers, or to assert that they cover the start, which he explains elsewhere; but, taking his entire testimony with all allowances, and with

a fair reconcilement of apparent inconsistencies, I think it justifies what I have already said in reference to it. Looking at the whole record, I can see no fundamental difference between the respondent's mechanism as shown in the patent under which it claims, and the pith of the complainant's invention as I have explained it.

Therefore I conclude that, independently of the reasons stated in the opinion of the court, the respondent infringes.