## CHADELOID CHEMICAL CO. v. WILSON REMOVER CO. et al.

### (District Court, S. D. New York. January 6, 1915.)

1. PATENTS ⬤⟾49—SUIT FOR INFRINGEMENT—EVIDENCE OF UTILITY.

   Ex parte experiments, conducted for the purpose of proving the inutility of a patented chemical composition for use in the arts, cannot overcome evidence that it has been substantially universally accepted by the trade and practical users.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 59–62; Dec. Dig. ⬤⟾49.]

2. PATENTS ⬤⟾328—VALIDITY AND INFRINGEMENT—PAINT REMOVER.

   The Ellis patent, No. 714,880, for a paint remover and process of making the same, is valid, of a basic character, and entitled to a broad construction; also *held* infringed.

In Equity. Suit by the Chadeloid Chemical Company against the Wilson Remover Company and John MacNaul Wilson. On final hearing. Decree for complainant.

Duncan & Duncan, of New York City, for complainant.
Merwin & Swenarton, of New York City, for defendants.

LEARNED HAND, District Judge. It is established beyond question that the trade had no satisfactory paint remover before Ellis' discovery. I do not mean that there had been no others tried, or that they had had no sale whatever; but the overwhelming testimony is that their sales were small, and that they caused much dissatisfaction. The presence of at least 20 per cent. of phenol was alone enough to account for this in the phenol removers, while all concede that the caustic soda solutions were not feasible. Ball's remover contained no phenol, and relied for its solvent upon benzol; but it had no wax, and the solvent evaporated too quickly to be serviceable. It is true that the defendant sold substantial quantities of Amylene up to 1903, amounting to over 3,000 gallons; but there is real ground to question whether the sales of a large portion of this did not result from the inventor Forrest's connection with the Long Island Railroad, and from his pecuniary arrangements with the defendant after March 1, 1902; and, diregarding this, the sales were only a minute fraction of what successful removers at once reached upon their appearance. It is therefore quite within moderation to repeat that no successful paint remover had appeared when Ellis set to work.

Immediately his invention went into great use, and has substantially controlled the field. The business grew enormously, and now

---

⬤⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

amounts to several hundreds of thousands of gallons per annum. Several persons attempted to disregard the patent; but they were unsuccessful, and much of the trade has taken out licenses. The patent at once filled the wants of the trade, and has held its ground for 11 or 12 years. There is surely some reason for this besides mere business exploitation. The need for a paint remover did not arise in 1902; it had always existed, as urgently before then as after; unsuccessful efforts had, indeed, been made to exploit several of the inventions containing phenol. All the elements, therefore, exist which justify one in calling Ellis' patent a pioneer.

[1] The defendant makes no effort to contradict this evidence, so I must suppose that it is not possible to do so. Its sole reliance is upon some experiments conducted ex parte by a young chemist of 28, whose qualifications consisted of a seven-year course in chemistry at Cooper Union, from which he graduated when he was 21, and during part of which he was employed elsewhere, and of subsequent work as a consulting chemist. Obviously such experiments count for nothing against the weight of the evidence which the trade here affords, and courts have always so understood. Rynear Co. v. Evans (C. C.) 83 Fed. 696; Plunger Elevator Co. v. Standard Co., 165 Fed. 906, 911, 91 C. C. A. 584; Bethlehem Steel Co. v. Niles (C. C.) 166 Fed. 888. The value of an invention gets its safest test from what those think of it who are looking impartially for the best thing they can get for their purpose; when they have so decisively declared against the old forms and for the new, no trials on mice or selected panels count for anything whatever. If the Bennett remover, or the Arnstein, are as much better than Ellis' as the defendant asserts, it may use either, as it did before; but, rightly or wrongly, the trade thinks that they are not so good, and that is the best test we have.

It is said, however, based wholly upon the experiments, that the success was not made through the patent, but through an evolution from it; that the patent was for a solution of four parts of paraffine wax, four of Currier's hard grease, with eight parts of benzol; that this is not a useful solution; and that the commercial form is made of paraffine only. Bacon's experiments prove, so far as they prove anything, only that the "suitable solution" of the patent was inferior; perhaps, indeed, that it was so inferior as to be altogether invalid as a disclosure. On examination, however, they prove too much, because they include, not only the "suitable solution" of the patent, but a commercial solution going by the name of "Adelite." Now, in all cases the "suitable solution" does nearly as well as Adelite, and in one instance more than twice as well. Bacon has proved, therefore, that a commercial remover is of the same grade as the "suitable solution," and the commercial remover has the approval of the whole trade. Such is the value of these experiments. Again, Ball's remover with wax added, and Bennett's with phenol removed, rank high under Bacon's experiments, yet each would be covered by the patent.

The defendant's explanation of this result is not good, which is that amyl alcohol was used, and only about one-eighth of the wax stated in the "suitable" example. Amyl alcohol, not fusel oil—which is by no means its equivalent—was one of the alcohols of the patent, and

the amount of wax is not prescribed in the patent. In final answer to the whole contention that the "suitable solution" was not practicable, it is enough to say that a paste made exactly after the directions of that example was sold under the name of "Phenoid" and had a successful, though limited, market.

However, even if the "suitable solution" had been very inferior, it would have been immaterial, if the patent had shown the road to success, as it certainly did. The commercial composition was clearly disclosed, because the patentee gives a large range of equivalents, both in solvents, waxes, and alcohols. The most that can be urged is that it was necessary to show proportions, and that the trade has used a much thinner mixture. No doubt a patentee must disclose at least one operable form of his invention; he must add to the knowledge of the art enough to make further invention unnecessary, in order to give the full benefit of his discovery; but there is not the slightest reason to doubt that, when he spoke to the art, the art understood him, and knew very well that they might put as much or as little wax into the mixture as served their immediate purpose. Thickeners had been common enough before, and, once the theory of the patent was disclosed, the proportions were not important. At least I may insist upon the defendant's showing that the disclosure was not clear, and this they have not done, unless by the most ambiguous results of the experiments, which in any case I should not regard.

[2] Having, therefore, determined that the patent is broadly valid, because of its basic character, the question arises of infringement. It is quite true that, put in one form, it is accurate to say that Ellis merely omitted one element of the prior art, phenol; but that is a very meager measure for the real invention. The fact was that the art had relied upon phenol (which no one wanted), because it was at once a potent solvent and a nonevaporant. Ball's remover went upon the theory that benzol and fusel oil should act as the solvent; but he had no wax to hold them from evaporation. Now, it is true that Bennett and Arnstein too used wax; but the proof that they did not understand its operation is found in the presence of such high percentages of phenol as even the defendant asserts to have been undesirable and unnecessary. They relied upon the phenol as a necessary solvent, and, if they thought the benzol also operated, they did not suppose that it could be relied on alone. Ellis dared omit the phenol, because he had worked out a way of holding his evaporating solvent, and that he did by uniting a solution of wax and the solvent with a miscible precipitant. Then it was easy enough to omit phenol, or put in as much as one might need, either as a disinfectant, or to avoid infringement, or for any other reason. That discovery released the art from the supposed need of phenol, but it depended upon a bit of chemical imagination, which no one till then had been able to construct.

If, then, it be asked at what point the percentage of phenol avoids infringement, the answer is not hard: Substantially at that point where the prior art supposed it was necessary, as shown by the lowest percentage it had reached. Since Ellis emancipated the art from the necessity, his monopoly should extend to the degree of that emancipation.

While, therefore, it is not necessary to show that the defendant added the proportion of phenol which it uses with the purpose of evading the patent, still such a fact, if proved, would throw some light upon the genuineness of its position that it took nothing from Ellis' disclosures. Up to 1903 it apparently continued the use of the old removers, containing percentages of phenol as high as 33 per cent. In 1903 the defendant changed its formula somewhat, particularly in reducing the phenol to 16 per cent., as appears by Forrest's formula. This was after the patent had appeared, and the change was probably made in view of the patent. Courts have always regarded the suppression of documents as a legitimate basis for inference, and the suppression of the letter here in question falls within that rule. Parties must understand that they adopt such methods at their peril. In 1906, and perhaps before, though I have not found the exact date, the defendant put out a neutral waxy remover, called "Liquinoid," which followed the patent, except that it contains hardly more than 2 per cent. of wax. It is but fair to say that this was not, strictly speaking, a remover proper. Rather it was a dip; but, as I have said, the proportion of wax was, under the prior art, clearly a variable matter, and nothing turns on the amount, provided its function existed. In the summer of 1906 Judge Hazel's decision in Chadeloid Chemical Co. v. Frank S. De Ronde Co., 146 Fed. 988, appeared, and the defendant interpreted it at once as possibly interfering with their sales, presumably of the Liquinoid, though it is true that they continued selling it into 1907. After advising with counsel how best to avoid the difficulties so arising, they put out Paintwood, Cleanwood, and a new Amylene, each containing about 14 per cent. phenol. Some controversy arose, and the defendant agreed to go to the old removers of 25 per cent., which apparently they did, at least so far as the plaintiff could learn. These proved unsatisfactory, and the present infringement was put out in 1910. This course of conduct hardly shows a very lively interest in the presence of phenol.

Moreover, there is good reason to believe that not all the phenol actually put into the defendant's Lingerwett and Wonderpaste remains uncombined with the waxes and therefore effective for any purpose. I am impressed with the low percentages which analysis disclosed in some of the defendant's products actually bought on the market. Whether or not this be true, there is no doubt that the alcohols neutralize the phenol, and make its effect upon the skin and tissues much less serious when used in the small quantities of the present removers. The defendant, whatever the scientific fact, is in no position to dispute that in practice the unneutralized phenol is reduced to much smaller proportions than the actual combination formula, for the record contains declarations from it of the small proportion of phenol which its removers contain. Thus it says, answering an assertion that the removers contained from 10 per cent. to 50 per cent. of phenol:

"The proportion of carbolic acid in the Wilson removers is not much greater than in carbolic vaseline"

—a proportion not over 3 per cent. They probably found this necessary because of the complaints and troubles generally arising from the

use of Paintlift, which appear at length in the record; but in any case the statement cannot be true, unless much of the phenol is combined with the wax, or at least rendered neutral. In any case I may take them at their word in corroboration of the plaintiff's proof upon the issue. Again, their frequent protestations in advertisements of the harmless character of their compound must, I think, be understood as referring to the absence of what had formerly been regarded as the most common harmful element. I cannot believe that any other element was in mind but phenol.

The usual decree will pass upon claims 6, 7, and 8, with costs.