## CARSON v. AMERICAN SMELTING & REFINING CO.

(Circuit Court of Appeals, Ninth Circuit. February 16, 1925. Rehearing Denied April 9, 1925.)

No. 4304.

**1. Patents ⟷328—Carson, 1,149,495 and 1,302,307, for metallurgical furnaces, held valid and infringed.**

The Carson patents, No. 1,149,495, for a metallurgical furnace, and No. 1,302,307, for construction of roof of open-hearth and reverberatory furnaces, granted on a divisional application, the essential feature of both being the feeding of the smelting ore into the furnace through openings in the roof near the side walls, from which it sinks to the floor by gravity, forming a sloping embankment against the walls, which protects them from the action of the bath, *held* not anticipated, valid, and to cover an invention of great utility; also *held* infringed.

**2. Patents ⟷65—Foreign patent anticipatory only as to what is clearly and definitely expressed.**

An American patent is not anticipated by a prior foreign patent, unless the latter exhibits the invention in such full, clear, and exact terms as to enable any person skilled in the art to practice it without the necessity of making experiments.

**3. Patents ⟷312(3)—Evidence of ex parte experiments more or less discredited.**

Evidence of experiments conducted by one party in the absence of his adversary, and from which visitors are excluded, is always received with suspicion, and is more or less discredited.

**4. Patents ⟷62—Prior use must be proved beyond reasonable doubt.**

Anticipation by prior use must be proved beyond reasonable doubt, and oral testimony, given several years after the alleged use, unsupported by patents or exhibits, is in the nature of the case gravely open to suspicion.

**5. Patents ⟷155 — Disclaimer held not to change nature of invention.**

Where a patent covered the use of either of two materials, in the alternative, a disclaimer as to one does not change the nature of the invention, but is merely a limitation.

**6. Patents ⟷149—Right of disclaimer is remedial.**

The right of disclaimer is remedial, and is entitled to a liberality of treatment so long as the claim is not mutilated, and nothing new is imported into it, and no deception or fraud is practiced.

**7. Patents ⟷109—Delay in filing divisional application held not laches.**

Where an invention was not only disclosed in the original application, but substantially claimed, though in an unscientific way, failure to file a divisional application until it was suggested by the patent office *held* not laches, which invalidated the patent therefor.

Appeal from the District Court of the United States for the Southern Division of the Western District of Washington; Jeremiah Neterer, Judge.

In Equity. Suit by George Campbell Carson against the American Smelting & Refining Company. Decree for defendant, and complainant appeals. Reversed and remanded.

For opinion below, see 293 F. 771.

John H. Miller, Chas. S. Wheeler, Jr., and A. W. Boyken, all of San Francisco, Cal., for appellant.

John A. Shackleford, of Tacoma, Wash., Frederick P. Fish, of Boston, Mass., Albert M. Austin, of New York City, and J. L. Stackpole, of Boston, Mass., for appellee.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

GILBERT, Circuit Judge. [1] The appellant brought suit for the infringement of the claims of two patents. The suit was dismissed on the ground that the claims were anticipated by the British patent to Siemens, No. 2,413, issued in 1866. The appellant's claims relate both to open-hearth and reverberatory furnaces used in smelting copper ores. His first patent, No. 1,149,495, issued August 10, 1915, is entitled "Metallurgical Furnace." The second patent, No. 1,302,307, entitled "Construction of Roof of Open-Hearth and Reverberatory Furnaces," was issued April 29, 1919, on a divisional application. The application for the first patent was filed January 15, 1907. It contained 12 claims. The appellant acted as his own attorney and drafted his claims and specifications. Owing to that fact and his lack of skill and knowledge of Patent Office procedure, his application met with many objections and much delay. The first objec-

tion was that the claims covered two distinct and independent inventions. It was not until August 10, 1915, that the first patent was allowed and issued, with a single claim.

Two months before it issued, the appellant filed the divisional application. It contained five claims, and, as the appellant again acted as his own attorney, it was not until four years later that the patent was granted. The principal ground of objection to that application was that the claims were anticipated by the British patent to Siemens. Upon a second appeal to the Board of Examiners, however, it was held that, while the application was a proper divisional application, the claims were not so worded as to avoid anticipation by Siemens. Said the Board of Examiners: "We think appellant has made an invention that is not disclosed in or suggested by Siemens, although the appealed claim does not define it. That invention may best be expressed in terms of process or method, although it may also be defined in terms of apparatus. Considering it to be the duty of this office to render all reasonable and proper assistance possible to applicants for patents, we are suggesting herein two claims that we think state the invention appellant has made and has been attempting to patent, and we recommend their allowance, if presented in lieu of the appealed claim." The claims so recommended were adopted by the appellant, and they are claims 2 and 3 of the patent as it was finally issued.

The claim of the first patent is as follows: "In a metallurgical furnace having receptacles arranged above the roof thereof, passages from said receptacles leading to said furnace arranged in such a manner that the material in said receptacles passes out into said furnace by gravity and forms the lining thereof."

In the second patent the claims here involved are as follows:

"2. The method of protecting the walls of an open hearth or reverberatory furnace which consists in feeding the ores or fettling materials into the furnace chamber near the upper part thereof, and in causing the same to form a sloping embankment resting upon the floor of the furnace chamber and along the walls within the chamber between the bath and walls.

"3. In an open hearth or reverberatory furnace, a floor, walls extending upwardly from the floor, and feeding ports leading into the upper part of the furnace chamber and being so located that the ores or fettling

materials entering therethrough may have unrestricted vertical movement downwardly to the said floor near the walls and may form sloping embankments against the walls to protect the latter from the heat and corrosive action of the metal bath."

Subsequently the appellant filed a disclaimer eliminating from the claims the words "or fettling materials."

The reverberatory furnaces in use prior to the appellant's invention were rectangular in shape, usually 120 feet long, 20 feet wide, and covered by an arched roof about 9 feet above the floor. The walls were perpendicular. The ore was introduced through a series of openings extending along the center of the line of the roof. The heat was introduced at one end. It was necessary to bank clay or similar material against the side walls in order to prevent disintegration caused by the excessive heat. The operation of leveling the piles of ore and the operation of banking the clay against the sides of the furnace were performed through apertures in the sides of the furnace. Both operations entailed loss of time and loss of heat. The appellant's invention consisted in supplying the ores through openings in the roof at the sides of the furnace and in utilizing the ore itself as it fell and was piled against the sides of the furnace as a protection against injury to the sidewalls in the smelting operation. It marked a distinct forward step in the construction and operation of reverberatory furnaces, and of its utility there can be no question.

Upon a careful consideration of the evidence, we are of the opinion that the Board of Examiners at the Patent Office correctly held that the appellant's invention is not anticipated by the Siemens patent. The Siemens patent, granted in 1866, was for a blast furnace designed for the proposed purpose of producing steel directly from iron ore, although Siemens added that it might be "used with advantage for the reduction of copper and other metallic ores." Siemens declared his invention to consist in exposing a mass of ore, "which may or may not be mixed with reducing agents or fluxes, to the surface action of intense heat produced by the combustion of highly heated air and gaseous fuel." The anticipatory feature of the Siemens furnace is claimed to be the sloping side walls of the reducing chamber, into which ore was to be supplied by gravity, so as to maintain the mass of ore upon the sides of the chamber in proportion as it is converted and fused, "so as to protect the walls or inclined sur-

faces thereof from the heat of the furnace and the corrosive action of the slags or cinders of the metallic bath by the interposition of the ore itself."

There was nothing new in constructing the bottom of the furnace with inclined sides. In so doing Siemens adopted the well-known and usual form of blast furnaces. Certain expressions in the Siemens patent are relied upon as indicating the anticipation of the appellant's patent. Thus he refers to the fact that the mass of ore is maintained upon the inclined planes by its own gravity, and that the principal advantage of his furnace is that the sides are protected against fusion by the presence of the ore or other substance to be melted, "particularly at the surface line of the liquid cinders where brickwork is rapidly destroyed," and in the specifications he says that his invention "consists in exposing a mass of ore to the surface action of intense heat, * * * the mass of ore being arranged in such a manner, by preference upon inclined plane and upon inclined surfaces, that the fused metal produced at the surface readily passes away therefrom, so as to leave such surface always exposed to the action of the heat."

But the oral testimony in the case, including the evidence furnished by two of the appellee's expert witnesses, fully supports, in our opinion, the finding of the Board of Examiners when they said: "It seems quite probable, therefore, that the layers of ore on the inclined walls of the Siemens furnace are relatively thin, as compared with the sloping walls of the appellant's furnace, and that the ores would not press on the surface of the heavy molten bath with a sufficient weight to sink through to the floor. If such be the case, the ores will not protect the walls just where they most need protection, and appellant's invention will not be realized." The Board further said: "We do not feel warranted in giving full credit to Siemens' statement in his fourth claim that the walls are protected from the high and corrosive heat of the slags or cinders of the metallic bath by the interposition of the ore itself. However, the slags or cinders are probably floating on the bath, so that, even if the ore on the sloping walls should serve to protect the walls from these slags or cinders, it would not protect the walls from the bath itself."

In brief, the Board were of the opinion that, if the angle of the inclined side walls was sufficient, as Siemens declared it to be, to maintain thereupon the ore by its own gravity, there was lacking the essential fea-

ture of the appellant's invention, in which the ores rest upon the floor of the furnace and against the side walls thereof, and by their own weight, unimpeded by an inclined surface, sink as rapidly as is permitted by the fusion of the mass upon the floor of the furnace. The Siemens patent was a failure, and it never went into use, and while it may be conceded that Siemens was the first to conceive the idea of utilizing the ores to protect the side walls of a furnace, the fact remains that, if his invention was ever at any time adopted in a reverberatory furnace, it must have resulted in failure, for we find for 40 years thereafter, and up to the time of the appellant's invention, that there was universal use in reverberatory furnaces of perpendicular side walls, the banking of materials against them for protection thereof, and the supply of ores through openings along or near the center line of the roof, and never at the sides.

[2] A foreign patent is to be measured as anticipatory, not by what might have been made out of it, but by what is clearly and definitely expressed in it. An American patent is not anticipated by a prior foreign patent, unless the latter exhibits the invention in such full, clear, and exact terms as to enable any person skilled in the art to practice it without the necessity of making experiments. Seymour v. Osborne, 11 Wall. 516, 555, 20 L. Ed. 33; Hanifen v. Armitage (C. C.) 117 F. 845; Permutit Co. v. Harvey Laundry Co. (C. C. A.) 279 F. 713; General Electric Co. v. Hoskins Mfg. Co., 224 F. 464, 140 C. C. A. 150. In Westinghouse Airbrake Co. v. Great Northern Ry. Co., 88 F. 258, 31 C. C. A. 525, the court said: "The prophetical suggestions in English patents of what can be done, when no one has ever tested by actual and hard experience and under the stress of competition the truth of these suggestions, or the practical difficulties in the way of their accomplishment, or even whether the suggestions are feasible, do not carry conviction of the truth of these frequent and vague statements."

[3] The court below was of the opinion that the practicability of the Siemens patent was established by the experiments made in the appellee's furnace at Garfield, Utah, after the commencement of litigation over the appellant's patent. The experiments were conducted by the appellee's employés. The chief operator testified that there were strict orders against the presence of visitors, and that neither the appellant nor any one in his behalf was invited to be present. Evi-

dence of experiments thus conducted by an interested party, and in the absence of his adversary, is always received with suspicion, and is more or less discredited. Carnegie Steel Co. v. Cambria Co., 185 U. S. 403, 420, 22 S. Ct. 698, 46 L. Ed. 968; Bethlehem Steel Co. v. Niles-Bement-Pond Co. (C. C.) 166 F. 880, 888; Bemis v. Charles A. Stevens & Bros. (C. C.) 177 F. 717, 721; Plunger Elevator Co. v. Standard Plunger E. Co., 165 F. 906, 911, 91 C. C. A. 584. The testimony of the appellee's witnesses was in substance that ordinary reverberatory furnaces were converted into Siemens furnaces by constructing, at the smelting ends thereof and for a distance of about one-half their length, supplemental sloping brick walls at an inclination of 60° in front of the vertical side walls, leaving the remainder of the furnaces with vertical side walls; that the ore poured into the furnace through the sides lodged on the sides and bottom, and under the influence of the heat it became semifused and provided a glazed-over surface; and that the first operation before actual smelting began was to form on the bottom of the smelting zone a similar semifused surface, thereby elevating the bottom of that portion above the bottom of the remainder of the furnace, so that the molten material trickling down the inclined sides of the melting zone, flowed therefrom to the lower end of the furnace, and was there collected in the form of a liquid pool.

One of the witnesses testified that in the smelting zone there was no matte whatever, "except that which is flowing down towards the settling end," and the proof was that at the settling end ore was put down through side holes to protect the sidewalls. Another witness, in answering the question, "What is the depth of the slag or matte bath in the smelting zone?" answered, "We do not carry a real matte bath; there is not a real slag bath at that end of the furnace." The substance of the testimony seems to be that there was at no time a molten bath adjacent to the portion of the furnace where the sides were thus inclined, but that it collected at the skimming end·of the furnace, where the walls were perpendicular and the sides thereof were protected by side charges, as in the appellant's patent. It would seem that the experiments have little value in determining the practicability of a furnace made with inclined sides throughout, as indicated in the Siemens patent, and that in the experiments as conducted the suggestions of the Siemens patent were expanded to

meet the requirements of successful operation in the light of subsequently acquired knowledge and experience. Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 S. Ct. 698, 46 L. Ed. 968.

Aside from the defense of anticipation, the appellee brings forward the contention that claims 2 and 3 of the divisional patent· are void for want of invention, in that they were perfectly obvious to anyone skilled in the art. This attitude of the appellee is directly the contrary of that which it assumed on its application in the Patent Office for reissue of the Charles patent, No. 871,477, of November 19, 1907, of which it was the assignee. Therein it copied literally claims 2 and 3 of the appellant's divisional patent and demanded an interference, asserting that Charles was the original and first inventor. In so doing the appellee vouched for the patentability of the features disclosed in the claims, and· also asserted their validity as against anticipation by the Siemens patent. We are of the opinion that the claims are not lacking in invention. The strongest circumstance in favor of their patentability is the fact that for nearly half a century ores had been fed into reverberatory furnaces through openings of the roof at or near the center line thereof, and it had occurred to no one to feed them through side openings. The appellant, according to the testimony, conceived in the year 1902 the idea of delivering the ores against the inner walls of the furnace. It was not until the year 1915 that his method was put into use, and thereafter its use was practically universal. Clearly its advantages had not been obvious to those who were skilled in the art.

It is contended that the appellant's original application for patent involved no invention other than a method of delivering fettling materials to protect the walls of a furnace through hoppers or passages at the sides of the roof, instead of shoveling it through openings in the sides of the furnace as was theretofore done. To sustain this the appellee refers to the specifications, in which the appellant more than once referred to the "refractory material or ores" which would pass by gravity into the furnace and form a border, resting on the hearth and against the walls of the furnace, to act as an inside lining and protect the latter from the scorification and erosion of the bath, etc. It is obvious, however, that the specifications embrace the two classes of furnaces which the appellant had in mind, the "open-hearth" and the "reverberatory" fur-

nace. He said: "My invention relates to furnaces for treating molten metals and smelting ores, such, for example, as reverberatory and open-hearth furnaces." It is fair to assume that, in adverting to refractory material, he meant open-hearth furnaces, and that in the case of a reverberatory furnace his intention was to supply charges of smelting ore along the side walls, which would become sloping embankments for protection.

The appellee further contends that the whole object and purpose expressed in the application for the first patent was only to protect the side walls of the furnace, by substituting a different method of supplying material therefor from that which had theretofore been used, and that there was no thought of supplying the material which was to be smelted otherwise than through openings along the center line of the roof, as was the practice theretofore. To this it is to be said that neither in the original application nor in any of the proceedings in the Patent Office did the appellant make reference to a supply of materials otherwise than through the side openings, nor did any other opening appear in the drawings until the substitute drawings, which were filed October 28, 1908. In those drawings appeared a hopper in the center of the roof. That feature of the drawing was immediately rejected by the Patent Office as new matter. Those substitute drawings were prepared by the appellant's solicitor, and the evidence indicates that the central hopper was added at the solicitor's own instance, and not on the authority of the appellant.

The same may be said of the appellant's Exhibit S. F. 19, which was shown to the witness Grant as a drawing made by the appellant. That drawing was originally in ink, but exhibited pencil additions, one of which was a central hopper. Grant testified that when it was shown to him the drawing was in ink, and that the pencil notations were not on it. It seems probable that the appellant's solicitor, at the time of preparing the substitute drawing above referred to, first sketched upon the drawing so made by the appellant, and which was exhibited to Grant, a representation of a center hopper. This is further indicated by the notable similarity between the sketches of the central hopper as they appear in both drawings. That the appellant's intention throughout, from the time of making his application to the time of the issuance of his patent, was to supply all ores through openings above the sides of the furnace walls, is, we think, conclusively shown by the fact that in all the drawings which he made and in the patent as finally issued no other openings are indicated for the supply of ores, but the roof of the furnace is presented as a solid bricked arch, unbroken and imperforate, except at the sides. And it was so understood in the Patent Office. Otherwise, the Board of Examiners would not have framed and suggested the claims which were embodied in the second patent.

The contention that the appellant derived the features embodied in the claims of his second patent from the Bender article, published in 1915, is not sustainable. It is contradicted by the testimony of Booth, who in 1906 was master mechanic for the Highland Boy smelter in Utah. He testified that in that year the appellant showed him a drawing "describing the plan for feeding the furnace along the side walls, instead of through the center, and told me that it would serve the double purpose of saving the fettling charge and protecting the walls of the furnace. He also described to me the method by which this was to be done and explained the drawing. * * * The charge was to be fed from the hoppers to the furnace, by operating the gate valves located in the bottom of the hopper. * * * It would be delivered directly along the side wall of the furnace and would flow down toward the center of the furnace, leaving the charge, when in repose, at the approximate angle of 45 degrees against the side wall of the furnace. * * * His intent to my mind was to feed the charge entirely on the side. * * * His idea was to protect the side walls by the charge lying against it, and the strong point to my mind at the time was the question of avoiding the expense of fettling the furnace. That this was the appellant's idea from the first is disclosed in the crudely drawn claims of the original application for the first patent. Claim No. 6 is as follows: "In a metallurgical furnace, means of feeding ore thereto by gravity, so that said ore will act as the linings for said furnace and absorb the heat radiated from the interior of said furnace, the metals of said ore being added to the bath within said furnace, in and for the purposes set forth." The same idea is carried forward in claim No. 9.

The appellee contends that Henry Lewis Charles invented side feeding and reduced his invention to practice at Butte, Mont., and at Bingham, Utah, before the earliest date of the appellant's invention, and that the Charles application for patent, filed on

March 26, 1907, discloses the appellant's idea of feeding ores through passages near the sides of the roof, to form lining or embankment against the walls of the furnace. The Charles patent discloses as its principal feature a method of feeding ores in a continuous or intermittent stream through numerous small openings in the roof of the furnace, and in addition thereto the use of small hoppers near the sides of the furnace, for the purpose of supplying silica or silicious material for fettling. Neither in the drawings nor the specifications is there a suggestion of the appellant's idea of feeding all the ores to be smelted through openings at the sides of the roof, so as to form a border resting on the hearth and against the walls of the furnace, and dispense with fettling. Nor does the evidence convince us that Charles put the appellant's invention into open and public use in 1905 or 1906. The evidence of such prior use consists wholly of the oral testimony of witnesses given 18 years after the event. It is unaccompanied by writing, drawing, model, or kindred exhibit, or physical evidence of any kind. Charles testified that in the roof of a furnace at Butte he first cut two holes over the angles made by the bridge wall and the sides of the furnace, that through those holes he introduced ores which at first did not act to his satisfaction, but that finally he poured a highly silicious ore carrying over 90 per cent. silica, which was found satisfactory.

If he did this he must have done it solely for the purpose of fettling the corners, as was later indicated in his patent, and he had no idea of supplying the furnace with smelting ore through such holes. He testified that his experiment was made, as nearly as he could recollect, about December, 1905. On January 2, 1920, he made an affidavit, in reply to a demand of the Patent Office that he designate the date when he made his invention. In that affidavit he stated that he was the superintendent in charge of the furnace at Butte from March, 1906, until the summer of that year; that "during this period side fettling through openings in the roof was continuously used, to the best of my belief." He stated that thereafter he went to Bingham, Utah, where he took steps to install mechanical feeding through the roof and along the sides of the furnace, "as shown in my patent. It is my belief that side feeding through holes cut in the roof was used at Bingham." A boilermaker, as witness for the appellee, testified that at Butte, in the winter of 1904

and the spring of 1905, he made a rough spouter pipe through which material was poured into the furnace by hand; that it was to be used for the protection of the side walls and bridge walls, but he did not know what kind of material was fed through them; that thereafter he went to Bingham, Utah, where small hoppers were again applied, two on each side; but that the main charge was supplied through hoppers in the center of the roof. The testimony of the other witnesses is all to the effect that silica and silicious ores were poured through the side hoppers to protect the walls.

There was testimony tending to contradict all the evidence of the experimental use at Butte and at Bingham. The general manager of the furnace at Butte, under whom Charles was employed as superintendent, but who left about the 1st of July, 1905, testified that while he was there no side hoppers were placed along the sides of the furnace and there was no side charging of ores. He thus contradicted the testimony of Charles that the side charges were in operation in May, 1905. Another witness, employed at the Butte furnace as chief assayer and a portion of the time as acting superintendent, testified that the old style of center charging and hand fettling was the only method practiced up to the time when he left, which was August 1, 1906. There was other testimony of workmen at Butte, who testified that the only method of charging was through the center hoppers, and that all the fettling was done through the side doors by hand. The testimony as to the practice at Bingham during the years 1906 and 1907 is very similar in character to that concerning the furnace at Butte. Of significance in this connection is a letter which Charles wrote to the Engineering and Mining Journal on September 6, 1915. In that letter he said he had proved "in a small experimental way in Montana that, if a satisfactory base were secured, the material could be dropped along the side walls or bridge and made to stick, just as it does on the bottom of the furnace when charged in the old way too rapidly." But later he added: "Before my plans were worked out, Mr. Heinze sold his Montana interests to the Amalgamated."

[4] In Deering v. Winona Harvester Works, 155 U. S. 286, 300, 15 S. Ct. 118, 123 (39 L. Ed. 153) it was said: "Oral testimony, unsupported by patents or exhibits, tending to show prior use of a device regularly patented, is, in the nature of the case, open to grave suspicion." And the

court affirmed the wisdom of the rule requiring such anticipation to be proven by evidence so cogent as to leave no reasonable doubt in the mind of the court that the transaction occurred substantially as stated. The court below found as follows: "Side feeding or charging was not practiced by Charles prior to the alleged invention by Carson. The most that was done was limited fettling back of the bridge and around the corner, and the only attempt was to protect the angle between the bridge wall and the side wall."

[5] The appellant filed in the Patent Office a disclaimer whereby he eliminated from the second claim of his second patent the words "or fettling materials," and subsequently a further disclaimer, limiting the ores to smelting ores, and excluding silicious ores used for fettling purposes. It is earnestly insisted by the appellee that by these disclaimers it was sought to change the subject-matter of the second patent and its claims, from the alleged invention of a method and means for feeding fettling materials and ores to protect the walls of a furnace to one for the method and means for feeding the smelting charge in the side holes in the roof and feeding them from nowhere else; that no such change can be made by disclaimer; that a disclaimer limits the scope of a patent, but cannot change the nature of the invention. The appellant answers that the two claims originally allowed contained the alternative expression "ores or fettling materials," and that the appellant, believing that this alternative expression was ambiguous, and might lead to future trouble, eliminated the words "or fettling materials," leaving the claims to cover only ores, which he had a clear right to do, and, being still further of the opinion that the word "ores" might include silicious ores, he filed his second disclaimer, in which he disclaimed such interpretation of the word "ores" as would include silicious ores used as fettling material and confined the word to smelting ores.

A disclaimer may never be resorted to for the purpose of materially altering the character of an invention. It can only be used to surrender some "separable matter, which can be exscinded without mutilating or changing what is left standing." Hailes v. Albany Stove Co., 123 U. S. 582, 8 S. Ct. 262, 31 L. Ed. 284. Said the court in O'Reilly v. Morse, 15 How. 62, 121 (14 L. Ed. 601): "The law which * * * permits him to disclaim is not penal but remedial. It is intended for the protection of the patentee as well as the public, and ought not, therefore, to receive a construction that would restrict its operation within narrower limits than its words fairly import." In Cartridge Co. v. Cartridge Co., 112 U. S. 624, 642, 5 S. Ct. 475, 485 (28 L. Ed. 828), it was said: "A disclaimer can be made only when something has been claimed of which the patentee was not the original or first inventor, and when it is intended to limit a claim in respect to the thing so not originally or first invented." Said the court in Sessions v. Romadka, 145 U. S. 29, 40, 12 S. Ct. 799, 801 (36 L. Ed. 609): "The power to disclaim is a beneficial one, and ought not to be denied, except where it is resorted to for a fraudulent and deceptive purpose."

Some confusion as to the meaning of the appellant's second patent arises from the fact that from the beginning the appellant's application covered two styles of furnace, the open-hearth and the reverberatory furnace—the former for manufacturing steel from pig iron introduced into the furnace from side doors, in which process fettling was necessary, and the latter a reverberatory furnace, used for smelting ores in which the appellant proposed to dispense with fettling and charge the furnace only with smelting ores introduced through side holes in the roof. If such was the scope of his invention, we are unable to see why he could not by disclaimers clarify his claim and render more certain that which he had invented. The appellee further asserts that the appellant attempts to give to the phrase "silicious ores" a strained and unsustainable meaning, and uses it in an effort to modify and transform the patent. This is fully answered by the testimony of the appellee's own witnesses and evidence. It appears therefrom that by "silicious ores" is meant ores having excess of silica of 50 per cent. or more, and that it is not practicable to smelt such ores in a furnace without the use of a flux.

The appellee points to the ruling of the Examiner in the interference proceedings in the Patent Office. In 1921 an interference was declared between claims 2 and 3 of the appellant's patent and claims identical therewith which had been adopted by Charles in his application for a reissue patent. Thereafter the appellant filed his disclaimers, and moved that the interference be reformed in accordance therewith. The Law Examiner ruled that the claims of the appellant's patent altered by the second disclaimer were not patentably different from

the claims of Charles involved in the interference, and said: "The disclaimer last filed, therefore, which seeks merely to impose arbitrarily such limitation upon the meaning of the term 'ores' in Carson's claim 2 as to exclude silicious ores, does not distinguish said claim patentably from the subject-matter of count 1, and particularly so in view of the fact that silicious ores may be smelting ores. A patentee may not be permitted to avoid an interference by merely disclaiming the right to use one of a plurality of agents that fall under a general term employed in a claim where the agents are equivalents. There would still remain a conflict as to the right to use any of the remaining agents."

In Dunbar v. Meyers, 94 U. S. 187, 24 L. Ed. 34, it was held that the disclaimer of the use of only one deflecting plate with a circular saw, and the limitation thereby of the claim to the use of two deflecting plates, was proper, where the patentee had used the alternative expression, "one or both" of said plates. The court said that the authority to make such disclaimer was beyond question. In Tuck v. Bramhill, Fed. Cas. No. 14213, 6 Blatchf. 95, the claim was for the forming of a packing roll for pistons of steam engines, "either in connection with the India rubber core or other elastic material, or without." It was held that this was equivalent to two separate claims, one for forming the roll with the core, and one for forming it without the core, and that, the latter being old and the former new, the patentee had the right to disclaim and limit his claim to the forming of the roll with the core. The court intimated that, even without the disclaimer, the patentee's invention might be protected in the suit for infringement.

[6] Numerous other decisions trend to the doctrine that the right of disclaimer is remedial, and is entitled to a liberality of treatment, so long as the claim is not mutilated, and nothing new is imported into it, and no deception or fraud is practiced. Manhattan General Construction Co. v. Helios Upton Co. (C. C.) 135 F. 785, 802; Schwartzwalder v. New York Filter Co., 66 F. 152, 13 C. C. A. 380; Electrical Accumulator Co. v. Julien Electric Co. (C. C.) 38 F. 117; Libbey v. Mt. Washington Glass Co. (C. C.) 26 F. 757; Page Mach. Co. v. Dow, Jones & Co. (C. C.) 200 F. 72; Bracewell v. Passaic Print Works (C. C.) 107 F. 467; Simplex Railway Appliance Co. v. Pressed Steel Car Co., 189 F. 70, 110 C. C. A. 634; Permutit Co. v. Harvey

Laundry Co. (C. C. A.) 279 F. 713, 721; Marconi Wireless T. Co. v. De Forest Radio T. & T. Co., 243 F. 560, 156 C. C. A. 258. Applicable, we think, to the case in hand, are the words of Judge Hough in the case last cited: "The mistake (if there was one) was in claiming something not needed, and the disclaimer abandoned what was not wanted, without broadening or enlarging any claim; it also left the claims fully supported by the original specification. No injury to defendant, or anyone else, is shown."

[7] In a reply brief the appellee raises for the first time the question of the appellant's laches in applying for his divisional patent, and cites Webster Co. v. Splitdorf Co., 264 U. S. 463, 44 S. Ct. 342, 68 L. Ed. 792, where it was held that the rule that a reissue patent, expanding the patentee's original claims, will be invalidated by a delay of two years in applying for it, unless special circumstances be proven justifying a longer delay, is applicable also to patents issued on divisional applications. In that case the patentee, Kane, applied for his patent on February 10, 1910, and more than eight years thereafter asserted new claims in a divisional application. The Supreme Court said: "The evidence establishes to our satisfaction that Kane did not originally intend to assert these amended claims, because he considered their subject-matter one merely of design and not invention, and the inference is fully warranted that the intention to do so was not entertained prior to 1918." The court adverted to the fact that during "all of this time" the subject-matter of the claims was disclosed and in general use, and said that it was a case of "unreasonable delay and neglect on the part of the applicant and his assignee in bringing forward claims broader than those originally sought."

From that case the case at bar differs materially. Here the applicant asserted in his original application, in an unscientific way it is true, but in language sufficiently intelligible, the invention which is the substance of the divisional patent. During the whole of the time of the pendency of his original application in the Patent Office the appellant was endeavoring to accomplish that which was finally done when, at the instance of the Patent Office officials, his invention was formulated in acceptable terms and expressed in the claims of the divisional patent. In Chapman v. Wintroath, 252 U. S. 137, 40 S. Ct. 236, 64 L. Ed. 491, the Supreme Court said: "Not only have later or divisional applications not been dealt with.

in a hostile spirit by the courts, but, on the contrary, designed as they are to secure the patent to the first discoverer, they have been favored to the extent that, where an invention clearly disclosed in an application, as in this case, is not claimed therein, but is subsequently claimed in another application, the original will be deemed a constructive reduction of the invention to practice, and the later one will be given the filing date of the earlier, with all of its priority of right." The appellant here has stronger equities than the patentee in the case last cited, for his invention is not only disclosed in the original application, but it was substantially claimed therein. The case is far from being that of a patentee, who waits until others have produced new forms of improvement and then, with the light thus acquired, applies for an enlargement of his claims to embrace those forms. The defense of laches, we think, cannot be sustained.

In support of the defense of noninfringement it is said that the creation and maintenance of a permanent immovable bank of raw, semifused, baked-in ore in the appellee's furnace does not embody the subject-matter of the appellant's claims; that the permanent embankment is not composed of material in the process of smelting, but remains in place, absolutely intact for months of operation. There can be no question but that the appellee infringes the claim of the appellant's first patent. It is true that in the appellee's structure the hoppers are elevated a short distance above the roof, whereas in the appellant's drawing the hoppers are contiguous to the roof. But the appellant's patent calls merely for placing the hoppers "above the roof," and the appellee has not in substance departed therefrom. As to the divisional patent, the evidence is that the appellee has operated its furnace at Tacoma in a different manner when treating ores alone from the manner when treating ores mixed with flotation concentrates. When treating ores alone, the ore was crushed to the necessary degree of fineness, mixed with fluxes, and so fed into the furnace as to build up sloping embankments. That method is covered by claim 2 of the appellant's second patent. And when operating with ores mixed with flotation concentrates—that is to say, ores which have been reduced to the highest degree of fineness—the appellee first builds up sloping embankments of raw ore, which are allowed to smelt until their surface becomes semifused. Thereafter flotation concentrates, mixed with other ores and fluxes, are fed through the side holes of the roof and allowed to flow down and over the sloping ore embankments.

In the smelting process, when the ore banks become depleted, resort is had to rebuilding, and fresh ore, without flotation concentrates, is fed for that purpose. It is obvious that by using calcium flotation concentrates mixed with ores and fluxes instead of ores alone there can be no avoidance of infringement. The evidence does not sustain the alleged difference predicated on the assertion that the appellee's sloping embankments are permanent and the appellant's are continually changing. The fact that a portion of the appellee's embankments immediately adjacent to the side walls is permanent results from the fact that the heat does not penetrate the whole distance, and the fact that as the embankment is reduced by smelting it is rebuilt with fresh batches of ore. Carson contemplated this when in his first patent he said: "Ideal smelting charges can be fed, and the portion next to the furnace walls never reach the point of fusion, while that portion in the interior of the furnace will be in a high state of fusion."

The decree is reversed, and the cause remanded for further proceedings.