**CARSON INV. CO. et al. v. ANACONDA COPPER MINING CO.**

(District Court, D. Montana. January 24, 1927.)

No. 229.

1. Patents ⬅66(1)—Prior patent is "anticipation" of one which merely corrects defects therein, which, and the remedy, were obvious to one skilled in the art.

A patent for an invention, which fails to work efficiently because of some minor defect, is none the less an anticipation of a later patent for a similar device, in which the defect is corrected, where both the defect and means of correction were obvious to any one skilled in the art.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Anticipation.]

2. Patents ⬅17(2)—Mere improvement which would occur to any skilled mechanic using process or machine is not invention.

Mere adjustments which improve are not inventions, if only what would naturally occur to any skilled mechanic in the ordinary use of process or machine.

3. Patents ⬅54—Defective machine may anticipate later process patent.

Even a defective machine, which with the adjustments an operator would sense and make, may anticipate a later process patent.

4. Patents ⬅328—Carson, 1,149,495 and 1,302,307, for metallurgical furnaces, held invalid for anticipation.

The Carson patents, No. 1,149,495, for a metallurgical furnace, and No. 1,302,307, for construction of roof of open hearth and reverberatory furnaces, granted on a divisional application, the essential feature of both being the feeding of the smelting ore into the furnace through openings in the roof near the side walls, from which it sinks to the floor by gravity, forming a sloping embankment against the walls, which protects them from the action of the bath, held anticipated by the Siemens patents, beginning with British patent 2,413 of 1866, in all of which protection of the walls by similar method was a feature, and also by prior public use. If conceded validity, held infringed.

5. Patents ⬅91(3)—"Rule of suspicion," in considering ex parte tests by party, not approved.

The "rule of suspicion," applied to ex parte lists and experiments made by one party to an infringement suit, is difficult to justify, as, while even severe scrutiny of evidence is one and a good thing, suspicion in the beginning is another and a bad thing, which prejudges the case, unmindful of the presumptions of truthfulness and common honesty, which should not be ignored by triers of facts.

6. Patents ⬅112(3)—Patents issued without due consideration of prior art are entitled to little presumption of validity.

Patents which issue without due consideration of the prior art are entitled to little, if any, presumption of validity.

In Equity. Suit by the Carson Investment Company and John Henry Miller, trustee, against the Anaconda Copper Mining Company. Decree for defendant.

See, also, 14 F.(2d) 559.

Kremer, Sanders & Kremer, of Butte, Mont., and John H. Miller, Charles S. Wheeler, Jr., and A. W. Boyken, all of San Francisco, Cal., for plaintiffs.

L. O. Evans, D. Gay Stivers, and John A. Groeneveld, all of Butte, Mont., D. Anthony Usina, of New York City, Jones, Addington, Ames & Seibold, W. Clyde Jones, Arthur A. Olson, Thorley von Holst, A. F. Mecklenburger, and Arthur B. Seibold, all of Chicago, Ill., for defendant.

BOURQUIN, District Judge. This is the usual infringement suit, involving the patents and claims upheld in Carson v. Company (C. C. A.) 4 F.(2d) 463. Defendant's motion to dismiss for defect of parties, made at beginning of trial (a dilatory and vile practice), not heard then, is denied now. Although Carson, one cestui of several, brought the suit ostensibly as sole owner, and which questionable tactics are poorly explained, and although contrary to former practice in equity, a cestui is not a necessary party, it is believed the interests of all cestuis warrant amendment to substitute owner and trustee.

The trial required, or rather consumed, 10 days, amassing some 1,600 pages of evidence and "near" evidence, 200 exhibits, and 300 pages of depositions, and 475 pages of briefs leisurely prepared during 3 months subsequent to trial, are contributed. The whole is a conglomeration wherein the material and necessary is as Gratiano's reasons, so far as environment is concerned. All this is not unusual, and may be imputed to (1) a large array of specialists, assistants, and their assistants, investigators, prompters, experts, etc., for strategical purposes in huddle on slightest provocation, to some extent inspired to display of abstruse learning and superior skill, if only to impress and awe others from forays in the specialist's fertile field; and (2) to the new equity rules. For, whatever else may be said of the latter, they require weeks to try a suit which formerly was presented in days, they have congested calendars, delayed litigation, and increased and intensified the labors of courts. Perhaps some time relief will be found in judges able as juries to forthwith decide, rather than after recollection wanes in awaiting deferred briefs.

Herein the issues are simple and few, and naught but the earlier case justifies extended consideration. Its record in large part in evidence, plaintiffs contend that in many particulars the appellate tribunal's decision therein is controlling here. In equity, it is the practice to thus introduce the record of the earlier patent suit to which a present party is a stranger, and for no very good reason. That assigned is comity, conformity, and stability of judicial decisions. There is, however, a more vital principle, which in balance of convenience and justice ought to be maintained, viz. no party shall be prejudiced by proceedings to which he is a stranger.

This principle controls in jury trials, the earlier record denied admission, and this distinction without difference exposes the fallacy of the practice; for what is competent before the one trier of facts is competent before the other, and neither ought to be influenced by incompetent evidence. At any rate the practice is nullified by the strategical discovery that the earlier record is "different." And it always is different—is different in the instant case. For always are differences in the imponderables at least, the imponderables so vital to credit and weight attaching to witnesses before the court; and new circumstances often require different construction of documents. Moreover, the integrity of trials demands that the judgment of one trier of facts be not influenced by that of some other in a different case.

The appellate tribunal's decision in said record is accorded due respect, but here, as elsewhere, it controls only to the extent it determines the law. In any event, different decrees may well be justified by different records. See Concrete, etc., Co. v. Gomery, 269 U. S. 177, 46 S. Ct. 42, 70 L. Ed. 222; Tilghman v. Proctor, 102 U. S. 708, 26 L. Ed. 279.

Adverting to the evidence, Carson applied for the earlier of the patents on January 15, 1907, and it issued on August 10, 1915. It is for "improvements in metallurgical furnaces." The specifications describe a process in instrumentalities, and the single claim is:

"In a metallurgical furnace, having receptacles arranged above the roof thereof, passages from said receptacles leading to said furnaces arranged in such a manner that the material in said receptacles passes out into said furnace by gravity and form the lining thereof."

So far as material, the following drawing from the patent discloses the invention:

In the meantime, conceiving he was not receiving his dues, Carson filed a divisional application on June 26, 1915, for "an improvement in the construction of roofs of open hearth and reverberatory furnaces," and patent issued on April 29, 1919. It contains three claims, the two involved being:

"2. The method of protecting the walls of an open hearth or reverberatory furnace which consists in feeding the ores or fettling materials into the furnace chamber near the upper part thereof, and in causing the same to form a sloping embankment resting upon the floor of the furnace chamber and along the walls within the chamber between the bath and walls.

"3. In an open hearth or reverberatory furnace, a floor, walls extending upwardly from the floor, and feeding ports leading in-

to the upper part of the furnace chamber and being so located that the ores or fettling materials entering therethrough may have unrestricted vertical movement downwardly to the said floor near the walls and may form sloping embankments against the walls to protect the latter from the heat and corrosive action of the metal bath."

The following drawing is from the patent:

*Fig. 1.*

By later disclaimers, "or fettling materials" was excluded from the claims, and the meaning of "ores" and "charge" was modified accordingly. Ignoring all crudities, ambiguities, and superfluities in Carson's applications, the invention claimed, patented, and involved is a process to protect the sides or walls of smelting furnaces from heat and bath, and that, by sloping embankments of ores upon the hearth and against the sides or walls, formed by gravity consequent upon feeding the ores into the furnace at or near the tops of the walls.

It is of defendant's contentions that therein Carson had been anticipated by disclosures in many patents to Siemens and others, and it is the court's judgment that the defense is made out. The Siemens patents follow:

British 167 of 1861, for improvements in smelting furnaces, is material, for that in its "sloping sides" of the hearth proper is the forerunner of the "inclined walls" of Siemens' later patents, for that it defines "plenum of pressure" (a term undefined in the next patent) as full atmospheric pressure, and for that he states that solids (fuel) to be treated will by gravity descend over an "inclined plane * * * at an angle of 45 degrees or thereabouts," and in a deep

layer will accumulate upon it and a grate or hearth of an angle of 30 degrees.

British 2,413 of 1866, for improvements in processes and furnaces, amongst the specifications being that:

"My invention has for its object the production of iron or steel directly from the ore and in a continuous manner, analogous in this respect to the continuous action of the blast furnace, and consists in exposing a mass of ore, which may or may not be mixed with reducing agents or fluxes, to the surface action of intense heat produced by the combusion of highly-heated air and gaseous fuel, and in introducing at the same time a current or currents of combustible gases, or of petroleum oil or other volatile hydrocarbons, alone or in combination with the combustible gases in amongst the mass of ore from below the same, so as to percolate through the mass, effecting its reduction, and at the same time enveloping its surface where exposed to the flame in a nonoxidizing or reducing atmosphere, yielding a certain amount of carbon tending to facilitate its fusion; the mass of ore being arranged in such a manner, by preference upon inclined surfaces, that the fused metal produced at the surface readily passes away therefrom, so as to leave such surface always exposed to the action of the heat. The fused metal and slag accumulating at the foot of the inclined surfaces of the ore are from time to time removed, while a mass of ore is maintained upon the inclined surfaces by its own gravitation, fresh ore being supplied from hoppers at the top of the incline in regulated quantities. * * *

"One of the principal advantages of this furnace is that the sides are protected against

fusion by the ore or other substance to be melted, particularly at the surface line of the liquid cinders, where brickwork is rapidly destroyed."

This patent describes in detail a complete principal process of iron ore smelting and steel manufacture, included within which is a minor or incidental process of ore protection of furnace walls. Other of the specifications is that a "plenum of pressure" be maintained, which, when reducing agents are mixed with oxide ores, will "cause a certain amount of gas to percolate upwards through the mass of ore" on the inclined walls and in the hoppers. Amongst other claims is:

"Fourth, arranging the chamber in which the simultaneous reduction and fusion of the steel or iron is effected in such a manner that the ore descends through hoppers or shafts upon the sides of the chamber, so as to protect the walls or inclined surfaces thereof from the heat of the furnace and the corrosive action of the slags or cinders of the metallic bath by the interposition of the ore itself, substantially as described with reference to the accompanying drawings."

Of various drawings, two of furnaces are below; Fig. 8 a modification of Fig. 1:

FIG. 8.

British 2,395 of August 21, 1867, is for like improvements, wherein oxide ores are reduced or deoxidized in vertical hoppers or retorts above the smelting chamber, into which they discharge between sides and center at the "surface of the metallic bath, or nearly so, in order to cause a more gradual and uniform descent of the ore into the furnace with as little exposure as possible of the spongy metal reduced in the hoppers to the oxidizing influence of the flame."

British 1,892 of 1868 is for like improvements, wherein for the vertical retorts of the 1867 patent is substituted a horizontal cylinder or muffle, which discharges through a vertical hopper "into the metallic bath of the melting furnace" at its center. This patent refers to that of 1867, both refer to that of 1866, and all three are of reference in that of April, 1871, next following. And the materiality of the 1867 patent and the 1868 patent consists in that the reference aforesaid in the patent of 1871 has been obvious-

ly misinterpreted as an admission by Siemens of failure of the process of wall protection by ore of his 1866 patent, and to this misinterpretation is mainly due the issuance of Carson's second patent.

United States patent 113,584 of April, 1871, is identical with British 594 of 1870. For like "improvements in processes and apparatus" in ore to steel manufacture, it refers to the patents of 1866, 1867, and 1868, as follows:

"In my British patent of 1866, No. 2,-413, I described a process and apparatus for the production of cast steel directly from the ore, with or without the addition of pig iron, and of ferromanganese or spiegeleisen.

"This process consisted, essentially, in effecting the reduction or deoxidation of the ore by the reaction upon it of carbonaceous matter under the influence of intense furnace heat, and in effecting the liquefaction of the reduced ore within the same furnace by the further addition of carbonaceous mat-

ter. It was found, however, in practice, that the deoxidation of the ore and the adjustment of the chemical condition of the metallic bath were attended with great difficulty under those circumstances, to remove which I subsequently separated the process of deoxidizing the ore from that of effecting its liquefaction and chemical adjustment by the introduction of vertical or other retorts, or of rotating muffles, as described in my British patents of the 21st of August, 1867, No. 2,395, and of the 10th of June, 1868, No. 1,892, respectively.

"Notwithstanding these improvements, it was difficult to realize all the conditions necessary to insure a satisfactory result. The reduction of iron ore in close retorts or muf-

repairing the sides from time to time"; that in the furnace preferred.

"In this furnace the crushed ore AA, mixed with the requisite percentage of flux and carbonaceous matter, as before described, is fed continuously onto the bed B through the hopper C, into which it is charged from trucks W, running on rails, as shown at Fig. 1. The ore is caused to pass gradually from the hopper in a thick layer down the inclined side D of the furnace, situated opposite the gas and air ports, which are all placed on one and the same side of the furnace, in a similar manner to arrangements already patented by me both in England and in the United States."

This furnace in longitudinal section follows:

Fig. 2.

fles is essentially a slow and expensive process, and the pulverulent iron produced thereby, upon being introduced into the melting furnace, floats upon the metallic bath for a considerable length of time without being being incorporated with it. Being exposed, in the meantime, to the oxidizing and sulphurizing action of the flame, the metallic oxide thus produced corrodes the banks of the metal bath, and, being a nonconductor of heat, causes the fluid metal below to set."

In description of a furnace, the specifications state that "refractory iron ore, such as hematite, may be used with advantage in

In respect to the misinterpretation aforesaid, it would seem that the Patent Office had not discovered the April, 1871, patent, for the only Siemens patent to which it referred is that of 1866. Apparently, however, Carson knew of others, for in his final argument before the Examiners he cited the April, 1871, patent and contended that in the foregoing quotations Siemens admitted that the incidental process of wall protection by ore of his 1866 patent had failed, and that, declared Carson, because the ore would not descend the inclined walls to the hearth, nor "prevent the oxide of iron from dissolv-

ing the silica out of the incline surfaces" at or "along the slag line."

The Patent Office accepted and acquiesced in this error, and because of it issued the second patent. Apparently the Patent Office thus perpetuated Carson's error, without even perusal of the April, 1871, patent; for it is clear, too clear for argument, that wherein that patent states the "oxide thus produced corrodes the banks of the metal bath," it refers to the furnaces of the 1867 and 1868 patents, center-charged and without ore wall protection, and not at all to the furnace of the 1866 patent, side-charged and with full ore wall protection.

Moreover, the reference in the April, 1871, patent to "repairing the *sides* from time to time," yields to the character of the furnace by Siemens preferred, viz. that of the drawing above, the ore charged at the *end,* down which wall the ore by gravity continuously descends "in a thick layer" fully protecting it, the *sides* not thus protected. And note well that in this patent 113,584, which is alleged to contain Siemens' admission of failure of his ore wall protection process, he prefers a furnace wherein the ends are fully thus protected. See Fig. 2 above. Of course, sides and ends are equivalents.

British 3,077 of November, 1871, is for like improvements, and refers to British 594, and so to United States 113,584. Therein Siemens describes, as the "best means which I know of carrying" the invention "into effect," the operation of the furnace in the drawing below:

That is, "the ore to be fused, mixed with about 5 per cent. of carbonaceous matter, is supplied to the hoppers and sinks down through the openings into the bed of the furnace, forming a sloping heap at either side. * * * The ore acted on by the flame is fused, and the liquid ore collects in the basin formed in the middle of the furnace between the two side heaps of ore," and that the metal might be drawn off through the trap door in the hearth, "or the fused ore may be tapped from time to time, so as to issue by a tap hole in the front of the furnace, whence it runs by a movable gutter O to the converting furnace P."

French 93,906 of 1872, for like improvements, and wherein are drawings of furnaces like those aforesaid of patents 113,584 and 3,077, the latter with and without a trap in the hearth. This patent is notable for that, whereas, in all other patents Siemens relied on common intelligence and knowledge of physical laws to select an angle for walls which would operate his plainly described ore wall protection process, in this patent he defines the angle as "about 50 centimeters (a 62 degree angle)."

All the foregoing issued to Charles Siemens, who died in 1883, and to his brother Frederick issued the last in evidence, viz.: British 14,143 of 1885, for "continuous reduction of iron ore." The specifications state that next to the furnace end, where heat is supplied—

"next to this end of the furnace I form a deep bed or basin, from which I carry a slope up to the extreme end of the furnace where there is an opening through the roof. Through this opening I feed pulverized ore mixed with reducing materials and fluxes. This as it gradually descends the slope is subjected to the radiant heat of the flame which has the effect of reducing the ore, and the metal produced flows down to the basin where it is collected with the slag above it. I provide a tapping hole from which the slag is allowed continuously to flow, and a lower tapping hole by which from time to time I draw off a portion of the molten metal, leaving always a large mass of the metal in the basin. I also provide a third tapping hole at the bottom of the basin for the purpose of running off the whole contents when desired.

"The furnace may be made in duplicate form, that is to say, with a slope on each side and the basin bed between them, the flues being arranged as described above so that the flame takes a direction at right angles to the lines of descent along the slopes."

And the claims are that:

"I make no general claim to a furnace in which ore descends a slope to feed a basin bed where in admixture with carbonaceous substances it is subject to the action of a gas flame but what I claim is:

"The construction of a regenerative gas furnace for continuous reduction of iron ore, having at one of its ends or sides the air and gas flues which communicate with the regenerators, having a deep basin bed provided with tap holes, and having beyond or at each side of the bed a slope fed with ore mixture from the crown of the furnace, the flues being so arranged and the furnace so proportioned that the flame acts by radiant heat alone, substantially as herein described."

The drawings are of furnaces like those aforesaid of patents 113,584 and 3,077, the latter without a trap in the hearth. Of other patents defendant presents Taylor's United States 843,776 of application in 1902 for an electric smelting furnace. The specifications state:

"As will readily be understood, the furnace is designed to obviate to the greatest possible degree loss of heat by radiation from the furnace walls and the corrosive action of the products upon the fixed elements of the furnace. The walls are protected at all points by the incoming charge and streams of conductive material."

Of the drawings is the furnace below:

Fig. 2.

A like furnace of Heroult's is illustrated and described in Borchers' Electric Smelting, 1904, London.

All these patents illustrate and describe the process of furnace wall protection with ore, whatever be the immaterial variations in specific uses, size, shape, preparatory, or final, or both, ores, fuel, product, or other incidentals of like kind.

It is not seriously contended that plaintiffs' patents and Siemens' do not disclose one and the same process of ore wall protection. In specifications they are in essentials the same. So they are in drawings, save that the drawing of Carson's second patent illustrates a literally impossible angle of repose of the ore.

If the claims of Siemens' 1866 patent and of Carson's be compared, they too in essentials are alike. Either will read on the specifications and drawings of the other, and might be interchanged without adverse effect. It is true Siemens' patents subsequent to that of 1866 make no claim for the process. They fully describe and illustrate it, however, and, if not sufficiently claimed in the 1866 patent, it was abandoned to the public. It must be remembered that a claim is not essential to anticipation. The latter arises from mere publication, whether in or out of a patent.

Plaintiffs' serious contention is that Siemens' process (1) has not been operated; (2) the inclined sides illustrated by Siemens are too flat to permit descent of ores by gravity; and (3) in operation the process fails. In the beginning, it may be noted that Charles Siemens was of superior scientific attainment, a prolific and successful inventor, and a great figure in the smelting art. It may be that the original concept of "pig and ore" steel manufacture was not his, but to him is due its development, application, and success. This came about through his invention of both the regenerative furnace, which in adjunct converts a reverberatory furnace to an open hearth, and of processes ("ore to steel," as well as "pig and ore") in connection with it. Between Siemens' processes and Bessemer's is divided the world of steel. It is unreasonable to suppose that his furnaces were mere inventive delusions for the 20 years of his patents, and it is a just inference that he operated them. Indeed, Dr. Handy testifies that "Siemens himself went into the steel business and used these various furnaces which he devised for greater or less lengths of time." And though he steadily changed and improved his furnaces and processes in

other particulars, the last, as the first, includes his original incidental process of ore wall protection. And since when is operation essential to the anticipation of a sufficient publication?

In the matter of the contention that the illustrations of Siemens' walls disclose an angle too flat to permit the ore to descend by gravity to the hearth, a sufficient answer is that Siemens' walls are of steeper angle than are Carson's. By this is meant Carson's actual walls of ore, not his vertical brick or metal backing to them. For if only Carson's pictured vertical walls do not inspire forgetfulness of natural laws, it will be perceived that to operate the process in Carson's furnace, the angle between hearth and walls must be filled with ore to the hopper mouth, the angle of repose of which ore will constitute a wall adown which all subsequent charges of ore must descend. Indeed, Carson's drawings of the first patent illustrate this indubitable truth. And this angle of repose is flatter than any wall illustrated by Siemens, and flatter than the 62 degree angle of his French patent. The evidence without conflict bears this out. It is that no smelting ores have an angle of repose steeper than Siemens' walls, and of many such ores it is much flatter, 30 degrees and less.

The consequence is clear. Ores will gravitate more easily down Siemens' smooth brick walls than down Carson's rough ore walls. It hardly needs be said that, in these circumstances, the ores in Siemens' furnace will descend to the hearth to the full extent they will in Carson's furnace; and any claim that the ores back of the plane of Carson's ore walls will favorably influence succeeding charges in their gravitation downward is pure fallacy.

Siemens' patents speak with the authority of experience, when they declare that the ore in the hopper "sinks down into the bed of the furnace, forming a sloping heap on either side, * * * the ore acted on by the flame is fused and the liquid ore collects in the basin formed in the middle of the furnace between the two side heaps of ore." See British 3,077 of 1871. Is it reasonable to believe that, if Siemens' ore wall protection process would not function on his walls, he would not have straightened them; that he would have perpetuated the error in a series of patents for 20 years?

[1] But grant, for the sake of argument, that Siemens' walls are too flat to accomplish what he so fully and clearly describes in the patent last aforesaid and elsewhere. None the less, they serve for anticipation. Why?

Because any one skilled in the art—more, any layman reading Siemens, advised of his object, observing the failure of his process to function over such walls—would instantly appreciate the mischief and the remedy, viz. too flat walls, to be raised more nearly vertical. He would indubitably comprehend that, if the ores would not descend to the hearth over Siemens' walls, they would over steeper walls. That is all Carson did, and that is merely mechanical, and not invention, is the mere "shadow of a shade of an idea," frowned upon in Atlantic Works v. Brady, 107 U. S. 200, 2 S. Ct. 225, 27 L. Ed. 438.

At best, what he did is but "as a skilled mechanic, witnessing the performance of a machine, inadequate, by reason of some defect, * * * by the application of his common knowledge and experience, perceives the reason of the failure, and supplies what is obviously wanting. It is but the display * * * of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the facility of manipulation which results from its habitual and intelligent practice; and is in no sense the creative work of that inventive faculty which it is the purpose of the Constitution and the patent laws to encourage and reward." Hollister v. Co., 113 U. S. 73, 5 S. Ct. 724, 28 L. Ed. 901, cited in Concrete, etc., Co. v. Gomery, 269 U. S. 177, 46 S. Ct. 42, 70 L. Ed. 222.

[2] The cited case reads on the instant suit, and illustrates the settled law that the mere adjustments which improve are not invention, if only what would naturally occur to any skilled mechanic in the ordinary use of process or machine, in the natural and to be anticipated progress in the art. In so far as it is argued that Siemens' failure to define the angle of his walls would involve experiment, that is not fatal to a patent, much less to a publication. The same argument was urged against Jones' steel patent, because he had not given the size of the reservoir, or the amount of metal to be conserved in it, and it failed there as here. Carnegie Steel Case, 185 U. S. 436, 437, 22 S. Ct. 698, 46 L. Ed. 968. See, also, the Minerals Separation Case, 242 U. S. 270, 271, 37 S. Ct. 82, 61 L. Ed. 286, which holds that in metallurgical patents the problems will admit of some indefiniteness involving experiment to make definite in any particular case.

In fact, plaintiffs have abandoned the contention of inoperativeness of Siemens' walls, or count little on it, now claiming in printed argument that even 60 degree walls infringe Carson. What, then, becomes of plaintiffs' case? For if 60 degree walls infringe (and they do), Siemens' 62 degree walls must anticipate (and they do).

Plaintiffs also contend that Siemens' process differs from Carson's, in that the former "maintains" the ores on the inclined walls, and does not intend them to rest on the hearth. That argument carried weight in the Patent Office and in the appellate tribunal. It is believed what has gone before suffices to refute it.

However, note that the contention was made in respect to the 1866 patent only. It can have no application to the patents of November, 1871, and 1872, which were not before either Patent Office or court, and wherein is plainly stated the ores from filled hoppers continuously gravitate adown the walls "to the hearth," and "in a thick layer sink down * * * into the bed of the furnace, forming a sloping heap at either side" on walls and hearth; the liquid ore collecting "in the basin formed in the middle of the furnace between the two side heaps of ore." Thus is described the process claimed by Carson, no less clearly than in plaintiffs' patents.

There is another aspect of Siemens' patents worthy of consideration. They were for devices and major processes, in great detail, to manufacture steel. Incidental thereto was included a minor process of ore wall protection. If in any respect the former encountered difficulties or failed, the latter is unaffected in its anticipatory effect at least. Invalid claims and valid claims often are contained in one patent.

Any difficulty with the processes of Siemens' 1866 patent was chemical, and not mechanical. This appears from his reference in the April, 1871, patent. His major process to manufacture iron and steel was new, and his difficulty was with reagents, chemical adjustments, the necessary varieties of impurities, amounts thereof, and when and where to introduce them into ores and furnace. This is a problem peculiar to iron and steel manufacture, as distinguished from copper, with which alone this suit has to deal. For, whereas, the success of the former depends upon judicious incorporation of impurities, that of the latter requires their exclusion altogether. This problem Siemens solved, and no doubt likewise solved that of ore wall protection; for in all his patents for improvements in the first he included the last. He may not have recognized its full value. Nevertheless he described it, and its simple instrumentalities, so that he who runs may read and practice.

[3] Even a defective machine, which with the adjustments an operator would sense and make, may anticipate a later process patent. See Carnegie Steel Case, 185 U. S. at bottom of page 424, 22 S. Ct. 698, 46 L. Ed. 968. Hence Siemens' machines, with full description of the process, must also anticipate.

Defendant, however, not content with the documentary evidence of the anticipatory effect of Siemens' patents, proceeded to demonstrate the fact by actual operation. In this, mindful of the "rule of suspicion," it invited plaintiffs to inspect and examine, which they did as fully as they desired. In its Anaconda plant, defendants built a furnace in essentials that of Siemens' 1866 patent, Fig. 1, and with ordinary ores and practice operated it continuously for seven months. The result was the ore wall protection process and the furnace functioned effectually, the walls fully protected, and the product per hearth area exceeded that of defendant's large reverberatories. In addition, defendant incorporated Siemens' inclined walls in one of said reverberatories, to like result.

To this the evidence is definite, clear, ample, credible, and convincing. Indeed, of these tests plaintiffs complain only that the furnaces were not Siemens' because they lacked the regenerative adjunct, were not open hearth, used oil and coal, instead of gas, did not use hydrocarbons in the ores on walls and in hoppers, curved the flame differently, had no hood to control escaping gases, if any, operated with copper ores, whereas Siemens' was primarily for iron ores, and the like. The answer is: (1) These are immaterial details; or (2) adaptation to analogous uses in exercise of skill in the art.

[4] Taken all in all, there is no doubt that, if Siemens' furnaces were later than Carson's, they would infringe, from which it follows that, being earlier, they anticipate. Likewise of the electric furnaces: They operate Carson's process, with immaterial variations in shape, size, fuel, and the like.

[5] Incidentally the rule of suspicion is difficult to justify. A trier of facts ought always to be mindful of the presumptions of truthfulness, common honesty, and innocence, and free from prejudice as from sympathy, from suspicion as from credulity. All prejudge the case and are enemies of justice. Close, even severe, scrutiny of evidence is one and a good thing; suspicion in the beginning is quite another and a bad thing. If the latter has place, it well might be extended to the patentee, who carries back his invention beyond a vital date, by no better evidence than that he disclosed it to a corroborating some one, sometime, somewhere.

Yet in behalf of the latter the rule of suspicion usually yields to the rule of sympathy. In any event, altogether too much is made of the 1866 patent. Of great importance in the earlier case, it is of little consequence in this, save as a connecting link in the evolution of the ore wall protection process. This may have had its inception in the sloping sides and stationary ores of the 1861 patent, and it has its full development in the inclined walls, over which from hoppers the ore continuously "sinks down * * * into the bed of the furnace, forming a sloping heap at either side" of the bath, of the November, 1871, and 1872 patents.

Whether the word "maintain" in the 1866 patent is used in the sense of stationary, or in the sense of gradual descent, as distinguished from precipitous fall, is now academic merely; but the latter seems to be Siemens' intent (1) for that is what occurs; and (2) the drawings depict walls of about 60 degrees, and in the 1861 patent Siemens had disclosed that even light solids from hoppers will gradually descend walls of 45 degrees, and upon it and a hearth of 30 degrees form a thick layer. That the heaps of ore are undermined by the bath, and thus only the process operates by ores filling the vacancy, is error. The ores smelt by radiant heat above the bath, and not by the bath itself; the side heaps of ore being reasonably permanent.

Carson's litigation drawings, to the contrary, conflict with his patent drawings, and are mere theory; he not having built, operated, or observed any furnace conforming to the drawings first aforesaid.

A further defense is that not Carson, but one John J. Case, is the first inventor. To this the evidence is that in 1898 Case was superintendent of the Lake Superior Copper Smelting Company; that he then devised and built in the Dollar Bay plant a reverberatory furnace (No. 8) without side doors, which was fettled with sand introduced through holes in the roof and along the side walls; and that this process operated successfully for several years, openly before a visiting public.

The original drawings of this furnace are in evidence. Of this there is no contradiction, and it deserves and receives credit. Also is evidence that in said plant, during 1903, three reverberatory furnaces (Nos. 9, 10, and 11) were built with 10 overhead hoppers, from which ores gravitated down through holes in the roofs and along the side walls,

forming sloping embankments on the hearths and against the walls; that no fettling was necessary or done; that this method was successful, and continued to 1906, openly before a visiting public; and that the furnaces altered to combination smelting and refining necessitated change to center charging. To this is the testimony of Case, Conant, assistant superintendent then, and superintendent now, Teefey, McGrath, Eldred, and Burke, who were operators of the furnaces during the period aforesaid and Valliere, who builded them. In addition are the original drawings, and an article in a local paper of date February 14, 1904, that each of said furnaces was fed with ores from ten overhead hoppers.

All this is controverted by plaintiffs, by the testimony of James Fernette, who worked upon other and center charged furnaces only; Des Roches, who was yard foreman, without duties in the furnace building, save to see that materials were duly supplied by others, and who admits to 10 hoppers upon No. 10, and to them an ore supply track which shifted from side to side of the furnace; Thomas, who worked on a refinery furnace some 300 feet distant; William Fernette, who was a mold-maker's assistant, was not employed upon these furnaces, though he sometimes entered the hoppers of No. 10 to "pick the silver," or dumped ore into them; and Rehaume, who was a refiner's assistant on other furnaces. Plaintiffs present other drawings from the Lake Superior Company's files, disclosing some ambiguous pencil notations claimed to impeach the drawings introduced by defendant. The former are not sufficiently identified and accounted for to overcome defendant's objections to their competency.

To impeach Case, plaintiffs introduce his affidavit, somewhat at variance with his testimony at the trial, but not vitally so. Hammer testifies that, before signing it, Case demanded $2,500, but received only $65. Case denies the demand, and explains what he received was for time and expenses from his home at Irvington to New York, where the affidavit was executed.

Plaintiffs also present Conant's published article of 1911, "Copper Smelting in Michigan," wherein is no mention of the side charging aforesaid. The article is contemporaneous and not historical.

It appears some of defendant's witnesses to public uses at Dollar Bay from it had received compensation for search for contemporaneous witnesses, and plaintiffs argue the "sympathetic interest" between copper producers. The Lake Superior Company opened its records to plaintiffs as to defendant, and no more than reasonable compensation paid for the necessary services aforesaid of itself goes for little.

In impeachment of plaintiffs' witnesses, defendant presented the following affidavits: James Fernette's, that Nos. 10 and 11 furnaces each had ten hoppers over roofs and sides; Thomas' and Rehaume's, likewise, and that ores therefrom formed embankments on the hearths and against the walls, dispensing with fettling.

Coming to the consideration of this evidence, it is not to be overlooked that, at the beginning of trial, plaintiffs moved to exclude oral testimony before the court in respect to the Dollar Bay public uses of the process in suit, and that the evidence be limited to depositions before a special master. In opposition defendant stated it had 15 such witnesses in attendance. The motion was denied, and the court invoked the rule of five witnesses thereto for each party. Defendant's tender of more was refused. In so far as it appears more than five testified for defendant, Case was to his invention, incidental to which he necessarily testified to furnaces, uses, and results, and Valliere was to his construction of the furnaces only.

In due consideration of the evidence in the matter of public use of the process in suit at Dollar Bay, it is found to establish the fact. And when is taken into account the elements of responsibility for management, devices, and operations, operators themselves, reasons and opportunities to observe, know, and remember, accuracy in observation, recollection, and report, the imponderables which affect credit and weight, and the quality and quantity of evidence necessary to satisfy the conscience and to produce conviction, the defense is made out, sustained beyond reasonable doubt.

Defendant alleges other public uses in various places, of comparative unimportance, evidenced by depositions. They need no consideration, for, if those of Dollar Bay are not proven, the others are not, and if the former are proven, like the wound of Mercutio, "'Twill serve."

To the Dollar Bay uses, it is true, there is some conflict in the evidence, but more apparent than real. In any event, however, to yield to plaintiffs' argument that, because of it, can be no proof beyond reasonable doubt, would strike at the foundation of the administration of justice, and head straight for anarchy.

[6] A principle not urged, and yet which

might have been of weight, is that patents which issue without due consideration of the prior art are entitled to little, if any, presumption of validity. See American, etc., Co. v. Sample (C. C. A.) 130 F. 149. To which, is ventured, might be added those patents issued because of misrepresentation, fraud, or mistake. As in frauds generally, proof of it ought to shift the burden of evidence. Although none but government can maintain suit to cancel the patent, any of the public from whose domain the intangible right in common possession is sought to be monopolized should be free to expose the fraud to that end. The situation is unlike that of a patent for a particular tract of land, not of possession enjoyed by all but by the patentee alone.

The statutory defenses are not a bar, for they are not an implied repeal of the principles of equity, of the rules of evidence and practice in the matter of fraud. Official negligence, or the patentee's misrepresentations, ought equally to be subject to the rule of the cited case. Carson's patents are in both categories. The first patent issued without a reference to a single Siemens patent. The second patent was preceded by reference to Siemens' 1866 patent only, and Carson cited and misinterpreted one more, that of April, 1871, which misinterpretation the Patent Office negligently made its own.

In the matter of Carson's misrepresentations, in addition to that aforesaid anent the Siemens April, 1871, patent, are others as follows. Impossible angles of repose in the drawings of the second patent; in respect to operative angles of repose in general, and wherein the Patent Office admitted it was ignorant; that the metal of the bath is more corrosive than the slag; and that he had built and fairly tested a Siemens furnace of the 1866 patent, and that it failed in the matter of the process of ore wall protection. This test he now virtually admits was sham, for he admits it was with pyrrhotite (iron sulphides), a nonsmelting ore, and so fusible it even fails in vertical hoppers, as Carson represented it did on Siemens' inclined walls, viz. "scaffolds," and will not descend. This was fraud by Carson. That one of his knowledge of and experience in smelting, for this test would select pyrrhotite of all ores, warrants no inference but an intent to deceive the Patent Office as he did.

These misrepresentations are material, apparently were accepted as true by the Patent Office, and clearly influenced its action. Incidentally, doubtless, Carson acted upon his estimate of the learning to be found in the Patent Office, disclosed in his communication of February 18, 1918, to the Commissioner, viz.: "I do not expect to find masters of metallurgy examining patents," and doubtless he felt justified by the event.

Adverting to the defense of noninfringement, without detail it may be said that in some kind and extent there is infringement, if Carson's patents are valid. That suffices here and now. The defense that Carson's disclaimers avoid his patents is advanced with labored, if ingenious, argument. It failed in the appellate court, and by the same token fails here.

Without more, the court finds for defendant and against plaintiffs, and decree goes accordingly.